HELENA AUTOMOBILE DEALERS ASSN., Appellant, *v.*
ANDERSON et al., Respondents; STATE ex Rel. Mc-
QUITTY, State Purchasing Agent, Intervener.

(No. 7,953.)

(Submitted December 13, 1939. Decided January 23, 1940.)

[98 Pac. (2d) 371.]

*Messrs. Toomey, McFarland & Chapman,* for Appellant, submitted a brief; *Mr. E. G. Toomey, Mr. John W. Chapman* and *Mr. Wilbur H. Wood,* of Counsel, argued the cause orally.

*Messrs. Paul W. Smith, David R. Smith* and *J. Miller Smith,* for Respondents, *Ernest Anderson, Jr.,* doing business as Anderson Motor Company and Capital Motors, Inc., submitted a brief; *Mr. Paul W. Smith* argued the cause orally.

*Messrs. Speer & Hoffman,* for Respondent, International Harvester Company, submitted a brief; *Mr. Harvey B. Hoffman* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. Mark H. Derr,* Assistant Attorney General, for Intervener, The State of Montana, submitted a brief; *Mr. Derr* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an appeal from a judgment in an action seeking to enjoin the defendants from violating the provisions of Chapter 80 of the Laws of 1937, commonly known as the "Unfair Practices Act."

The lower court sustained a demurrer to the plaintiff's complaint interposed by defendant International Harvester Company, and overruled the plaintiff's demurrer to the answers interposed by the other defendants and to the complaint in intervention filed by the state. The plaintiff elected to stand on the complaint and appealed from the judgment rendered against it dismissing the action.

The complaint alleges a violation by defendants of Chapter 80, Laws of 1937, by selling automobiles to the state of Montana at a price below the minimum fixed by that Chapter. The constitutionality of the Act has already been determined. (*Associated Merchants of Montana* v. *Ormesher*, 107 Mont. 530, 86 Pac. (2d) 1031.)

Defendants contend, and the court found, that the sale of merchandise to the state of Montana is excepted from the provisions of the Act. The correctness of that conclusion determines the propriety of the judgment appealed from. The Act itself deals solely with sellers and imposes no restrictions, qualifications or penalties upon buyers. The state of Montana is not mentioned in the Act, and sales to it are thus not expressly exempted; nor does the Act in anywise define the term "buyer." It simply denounces sales made below cost when the purpose is to injure competitors or to destroy competition. The cost is to be determined according to a certain formula fixed in the Act.

We are called upon to determine whether it was the legislative intent to exempt sales made to the state of Montana from the provisions of the Act. Defendants contend that the legislature did not intend that sales to the state be included in the Act, because to do so would be to violate the general

rule of statutory construction that "the state is not bound by the provisions of a general statute, where the effect of such statute would be to restrict the rights of the state, to affect its interests, or to impose liabilities upon it, unless it is named expressly." (*Morris* v. *State ex rel. Walcott,* 88 Okl. 189, 212 Pac. 588; and see *Aetna Accident & Liability Co.* v. *Miller,* 54 Mont. 377, 170 Pac. 760, L. R. A. 1918C, 954.)

As before stated, the state is not mentioned in the Act. Whether the Act would apply to the state as a seller we need not now determine. It does not restrict the state or affect its legitimate interests as a buyer. The purpose to be accomplished by Chapter 80 can as well be defeated by sales to the state as to others. If sales below cost when made to individuals for the purpose of injuring competition and destroying competition are unlawful, then such sales to the state for the same purpose are likewise unlawful—absent any express exception in favor of those selling to the state. Compare *City of Billings* v. *Public Service Com.,* 67 Mont. 29, 214 Pac. 608, where it is held that a statute preventing discrimination in utility rates applies to rates imposed against a municipality as well as to individuals.

It is urged that since the Act does not expressly amend section 293.3, Revised Codes, the intent is manifest that the legislature exempted sales made to the state. Section 293.3 provides for the purchase of state supplies by awarding contracts to the lowest responsible bidder. Chapter 80, which makes no exception in case of sales to the state, when read in conjunction with section 293.3, contemplates that sellers to the state will confine their bids within the limit fixed as legitimate by Chapter 80. The enactment of section 293.3 was to guard against overcharges against the state. Chapter 80 gives protection to sellers from unfair competition. The two work harmoniously together and it cannot be said that because section 293.3 was not changed, the legislature intended that Chapter 80 should not apply to sales made to the state. Language used in the case of *B. T. Johnson Pub. Co.* v. *Mills,* 79 Miss.

543, 31 So. 101, which apparently reaches a different conclusion, is not persuasive under statutes such as ours.

The complaint in intervention as well as the answer of the two defendants who answered, contain general denials of the allegations of the complaint to the effect that the sales below cost were made for the purpose of injuring competitors and destroying competition; hence, to that extent, they constitute a defense to the complaint, and it was proper to overrule the general demurrers thereto. It was error, however, to sustain the demurrer of the defendant International Harvester Company to plaintiff's complaint.

The judgment is reversed and the cause remanded with directions to set aside the order sustaining, and to enter an order overruling the demurrer to plaintiff's complaint, and awarding the defendant International Harvester Company a reasonable time, to be fixed by the court, to plead further.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ARNOLD and ERICKSON concur.

STANDARD OIL CO., RESPONDENT, *v.* STATE BOARD OF EQUALIZATION ET AL., APPELLANTS.

(No. 7,993.)

(Submitted December 15, 1939. Decided January 24, 1940.)

[99 Pac. (2d) 229.]

6

*Mr. Ralph J. Anderson,* for Appellants, submitted a brief and argued the cause orally.

*Messrs. Toomey, McFarland & Chapman* and *Mr. Wilbur H. Wood,* for Respondent, submitted a brief; *Mr. E. G. Toomey* and *Mr. John W. Chapman* argued the cause orally.

8

10

*Mr. John G. Brown* and *Mr. William A. Brown,* appearing as *Amici Curiae,* submitted a brief; the former argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This action was brought by the respondent Standard Oil Company of Indiana to recover taxes paid under protest imposed under the Chain Store License Tax Law of 1933, Chapter 155. (Secs. 2420.1–2420.11, Rev. Codes.)

The complaint relates to taxes paid in the years 1934, 1935 and 1936. An examination of the record reveals that there is no dispute as to the amounts of taxes if the oil company was liable to the tax. The cause was tried before the court sitting without a jury. The trial judge adopted the findings and conclusions of law proposed by the plaintiff, and found against the defendant board. The appeal is from the judgment in the district court of Lewis and Clark county.

At the trial testimony was admitted to the effect that Chapter 155 was enacted after the time for the regular ses-

sion of the legislature had expired as provided in section 5, Article V of the Constitution of the state of Montana. This section provides: "No session of the legislative assembly * * * shall exceed sixty days." The journals of the house and senate show that the bill was enacted within sixty days from the convening of the assembly. The board urges that it was error on the part of the lower court to admit the testimony contradicting the journals.

The ordinary rule is that courts will not go behind the enrolled bill to determine its validity; however, this court has gone behind the enrolled bill to the journals to ascertain if a constitutional amendment had been set out at length in the journals, as required by section 9, Article XIX of the Constitution (*Thompson Investment Co.* v. *Durfee*, 22 Mont. 354, 56 Pac. 582; *Martien* v. *Porter*, 68 Mont. 450, 219 Pac. 817; *Tipton* v. *Mitchell*, 97 Mont. 420, 35 Pac. (2d) 110); and to determine if the aye and nay votes have been recorded in the journals pursuant to the command of section 24, Article V (*Johnson* v. *City of Great Falls*, 38 Mont. 369, 99 Pac. 1059, 16 Ann. Cas. 974; *Palatine Ins. Co.* v. *Northern Pac. Ry. Co.*, 34 Mont. 268, 85 Pac. 1032, 9 Ann. Cas. 579). We are here asked in a collateral attack to go back not only of the enrolled bill but also of the journals themselves, and that is what the district court did when it admitted oral testimony to contradict the journals.

The journals on their face show compliance with section 5 of Article V, and the universal rule is that in an attack on the validity of a legislative enactment the journals import absolute verity. They show the action of the assembly. They are the official records of one of the three coordinate branches of the government, and certainly at least in an action where a legislative enactment is collaterally attacked, they are binding on the courts.

Every law enacted in the last few days of the session, and particularly on the last day, could not be considered effective until testimony was taken before a court and until, on the statements of witnesses as to the time of the final enactment

of the bill the court had determined the law's validity. And certainly to allow this attack in anything but a direct proceeding to correct the journal where the various officers of the assembly would be parties, cannot be countenanced by any court. The following language found in *Earnest* v. *Sargent,* 20 N. M. 427, 150 Pac. 1018, 1020, is apt: "A controversy might arise in time as to whether the time for adjournment had arrived before the conclusion of the business of the session, and as many differences of opinion might arise as there are members of the houses. Watches and clocks would be the criterion, and one member might claim that the hour of 12 had arrived by his watch, and another member might claim that the hour of 12 had not arrived by his watch. Therefore, when the Legislature writes its journal, and states, as this journal states, that all of the business involved in this discussion had been completed before the moment of time for adjournment had arrived, the rule of law and the rule of common sense is that it shall not be contradicted by the evidence of witnesses." (And see *State ex rel. Lane Drug Stores* v. *Simpson,* 122 Fla. 582, 166 So. 227; *State* v. *Smart,* 22 Wyo. 154, 136 Pac. 452; *White* v. *Hinton,* 3 Wyo. 753, 30 Pac. 953, 17 L. R. A. 66; *Territory ex rel. Haller* v. *Clayton,* 5 Utah, 598, 18 Pac. 628.).

The district court found that the plaintiff was not a chain store in its operations in connection with the various leased stations in question, within the provisions of section 8, Chapter 155 of the Laws of 1933, which reads as follows: "The term 'store' as used in this Act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained or controlled by the same person, firm, corporation, co-partnership or association, either domestic or foreign, in which goods, wares, or merchandise or petroleum products of any kind, are sold, either at retail or wholesale."

The single fact question determinative of this cause is the one of control of the leased stations of the plaintiff. The district court found that there was not the control contemplated by the section above set out.

The plaintiff paid the chain store tax, on a number of stations owned by it, under protest and which were leased to various individuals. The suit involved these taxes so paid. The leases on the stations in question were all the same, except as to the parties, description, rental and items of equipment. The stations were leased fully equipped, including even minor tools and advertising signs, so that the lessee had no investment in site, building, equipment or appliances. ·The term of the leases was for six months. Under the usual lease as introduced in evidence the lessee holding over was a tenant from month to month, though some leases provided that a holdover operator held for a subsequent term of six months. At most, the tenant under any of the leases had a six-months term. The leases provided for rental on a gallonage basis, and further provided that the rental should be collected at the time of the delivery of the gasoline to the station. In one instance it appears that there was also a cash rental as well as a gallonage rental.

The chief witness in the proceeding was Mr. Hay, the state manager of the plaintiff, who testified in its behalf. His testimony is often self-contradictory and vague, but in addition to the facts appearing in the exhibits, from his testimony the following uncontroverted facts can be gleaned: Though there was no requirement in the lease that the operators buy their petroleum products from the plaintiff, in only one instance did any lessee buy gasoline from another company, and then it was because the lessee had to do so to collect for damage incurred by him due to a collision with the dealer's truck. In another instance a lessee bought some fuel oil from another dealer. Thus, with these exceptions, it appears from Hay's testimony that in fact the lessee bought nothing but Standard Oil petroleum products, with the exception of products not handled by plaintiff. That the plaintiff company controlled the lessees in their purchase of oil products is shown by this fact; but if there were any question on the matter it is resolved by other circumstances. The short term of the leases negatives the idea that the plaintiff was only in the real estate

business and was not protecting its wholesale petroleum products outlet by arrangements whereby lessees of the retail stations would be forced to buy Standard Oil products. The only logical inference to be drawn from the shortness of the term of the leases, and the fact that the operators sold Standard products exclusively is that purchase of competing products would result in refusal of plaintiff to renew the leases at their expiration.

Two other facts are significant to show that the lessees were effectively controlled as to the purchase of products. The first is that the rentals were to be collected when the gasoline was delivered to the station. The plaintiff could know if the gasoline were delivered by its wholesalers what the rentals would be, and it is apparent it was because it was to sell the gasoline to the lessee that the provision appears. No other inference is plausible. If others were to sell competing gasoline to the lessee, the plaintiff would have no method of checking deliveries made and collection of the rental at that time would not be practical. The second significant fact showing control is that each lease provided that the station be turned back to the plaintiff painted the same as it was when the operator took it. Hay testified the stations all had the same paint design and Standard Oil colors. The testimony, including even that of Hay, after many contrary statements, is that the stations had the Standard Oil signs on them at the time the lessees assumed possession. The requirement that the stations be returned with the same paint design and color as when they were taken over, supports but one view, i. e., that it was contemplated by both parties that the operator was to deal in Standard Oil products only. Then, too, distinctive Standard Oil products caps for the oil pumps were included in the equipment. All of these things together with the fact that the many operators sold no competing products, show the control contemplated by section 8 of the Act.

For cases with similar facts which hold as we are holding, see *Maxwell* v. *Shell Eastern Petroleum Co.*, (4 Cir.) 90 Fed. (2d) 39, affirmed 302 U. S. 715, 58 Sup. Ct. 34, 82 L. Ed. 552; *Bed-*

*ford* v. *Gamble-Skogmo,* 104 Colo. 424, 91 Pac. (2d) 475; and see, also, *Midwestern Petroleum Corp.* v. *State Board of Tax Commrs.,* 206 Ind. 688, 187 N. E. 882, 191 N. E. 153; *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 96, 55 Sup. Ct. 333, 79 L. Ed. 780; *Ashland Refining Co.* v. *Fox,* (D. C.) 11 Fed. Supp. 431, affirmed 297 U. S. 381, 56 Sup. Ct. 510, 80 L. Ed. 731.

There is other testimony as to advertising which shows the true status of the plaintiff, and which tends to show that it comes within the provisions of the statute, such as testimony that it inspected the various stations, the manner in which the business was conducted, and testimony that it offered courses of instructions to operators and instructed them as to methods, etc.

Without this latter testimony and from the plaintiff's exhibits and its testimony, the findings of the lower court are erroneous, there being no question of conflicting evidence, and the facts all being determined from plaintiff's evidence, we find that plaintiff oil company controlled the various stations in question, as contemplated by section 8 of Chapter 155, Laws of 1933.

The lower court found as a matter of law that even though Chapter 155 were validly enacted, and even though plaintiff company came within the provisions of section 8 of Chapter 155, the plaintiff must still prevail as the Act is an arbitrary, unlawful and unreasonable discrimination against the company. The court found that the enforcement of the Act would deprive the company of its property without due process of law and would deny to it the equal protection of the law.

The plaintiff in its brief says:

"In advancing this contention, we are fully aware of the several decisions of the Supreme Court of the United States cited by appellants, holding that graduated chain store taxes are not invalid upon this ground, and we recognize the binding force of these decisions in this matter of interpretation of the federal Constitution but we assert that the facts involved in those cases are. not akin to the facts here found, and that the type of classification established by Chapter 155, as applied to the respondent here, has never been considered by the fed-

eral courts, and that the question here presented is one of first impression in this or any appellate court.

"The distinction lies in this, that the Supreme Court cases, in each instance, the person or corporation upon whom the tax was laid was the actual operator of the various retail outlets taxed, actually engaged in retailing commodities to the public, while in the instant case the respondent, as the trial court found, on substantial competent evidence, did no retailing and merely owned the various parcels of real property and the buildings thereon and leased these to independent persons, who, in turn, retailed the commodities sold to them by the respondent. Thus the tax imposed by Chapter 155, as laid upon the respondent, is based upon its ownership and leasing of retail outlets to others who buy at wholesale, take title to and resell upon their own terms, products of the respondent.

"In other words, if appellants are correct in their interpretation of the Act, namely, that by such activity the respondent is operating, maintaining, controlling, etc., stores within the meaning of the Act, such interpretation is discriminatory against respondent in that it subjects it to a tax for so leasing its real property while other owners of real property leasing several sites to retailers are not subjected to such penalty. There is no reasonable basis for so setting the leasing activities of this respondent in the class of chain store retailers, while other lessors of multiple units are excluded from the class."

The plaintiff takes the position that the method of operation here found does not bring the company within any of the examples to be found in the cases cited by defendant board. It is its position that the advantages accruing to the operator of a chain of stores which are the basis of the holding of the Supreme Court of the United States that the legislature was justified in its classification in enacting chain store license tax laws are not to be found in its operations. The plaintiff returns on this point in the argument to its position that it is primarily interested in leasing the various oil stations as a landowner and not as a purveyor of petroleum products. In the earlier part of this opinion we have found otherwise.

The plaintiff urges that since its only interest in the operation of these stations is as a landlord, then unless the license tax applies to all landlords who own property and lease it to independent operators in the retail business, the tax is unjust and discriminatory. In view of what we have said before as to the control exercised by the plaintiff and the purpose of the control, the argument has no merit. The ultimate object of the arrangements on the part of the plaintiff was to promote an increase in the sale of its products. By its widespread advertising, uniformity in architectural style of the various stations, the uniformity of the paint designs and color, the signs on the stations, the roadside signs and control of the products to be sold, it is given advantages in the distribution of its products which independent operators would not have. The mere fact that the various stations are held under lease by a technically independent operator does not eliminate the fact that by the method of operation here followed by the oil company it gained advantages over the one-station unit.

It should require no argument to demonstrate the fact, for it is common knowledge that motorists in entering a strange town almost invariably make their purchases from stations in chains, such as is the case of the leased stations here in question. The language of the court in *State Board of Tax Commrs.* v. *Jackson,* 283 U. S. 527, 51 Sup. Ct. 540, 543, 75 L. Ed. 1248, 73 A. L. R. 1464, 75 A. L. R. 1536, is pertinent: " 'A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses, or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' It is not the function of this court in cases like the present to consider the propriety or justness of the tax, to seek for the motives, or to criticize the public policy which prompted the adoption of the legislation. Our duty is to sustain the classification adopted by the legislature if there are substantial differences between the occupations

18

separately classified. Such differences need not be great. The past decisions of the court make this abundantly clear."

The plaintiff in endeavoring to distinguish the fact situation in the present case from the situation in the cases passed upon by the United States Supreme Court, makes applicable this language in *Liggett Co.* v. *Lee*, 288 U. S. 517, 53 Sup. Ct. 481, 484, 77 L. Ed. 929, 85 A. L. R. 699: "In their endeavor thus to distinguish the earlier case, the appellants stress mere details, but ignore the underlying reason for sustaining the classification there attacked. The decision in the *Jackson Case* was based, not upon any single feature of chain store management, but upon the ultimate fact of common knowledge, illustrated and emphasized by the evidence, that the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store; and that the difference between an integrated and a voluntary chain is fundamental. While incidents of the operation of the one may be quite similar to those found in the other, there is a clear distinction between one owner operating many stores and many owners each operating his own store with a greater or less measure of co-operation voluntarily undertaken. The legislature may make the distinction the occasion of classification for purposes of taxation. Neither similarity of opportunities and advantages in some aspects, nor the fact that the one kind of store competes with the other, is enough to condemn the discrimination in the taxes imposed. It is needless to repeat what was said in the *Jackson Case* to the effect that the difference between the subjects taxed need not be great, and that, if any reasonable distinction can be found, the duty of the court is to sustain the classification embodied in the law."

As we have indicated, the record shows that the primary purpose of the plaintiff in its ownership of the stations and the arrangements under which the stations are leased is to secure the sale of the products of the plaintiff. That fact differentiates the position of the plaintiff and that of the ordinary landlord renting out property for retail store purposes. The ordinary

landlord is compensated only by the rental received for the property. The difference in situation between the plaintiff and the landlord is sufficient to authorize the classification for the purpose of taxation.

After an examination of all of the cases cited by the defendant board and of those so cited which the plaintiff, as has been indicated, admits are binding on it, we cannot but conclude that the classification made by the legislature as applied to the oil company in its operations in connection with the leased stations in question is not unreasonable, discriminatory nor arbitrary; nor does it deny to the plaintiff the equal protection of the law. The general arrangements as to these leased stations give to the plaintiff and the operators of the stations all of the benefits of chain organization in such a sense and measure as to fall within the scope of the decision on the question, and even if it did not, the position of the plaintiff company is so different from that of the ordinary landlord that the classification does not bring it within the constitutional provision relied upon.

20

Rehearing denied February 28, 1940.