WABASH R. R. CO. v. FINNEGAN, Collector of Internal Revenue, First District of Missouri (RAILWAY EMPLOYES DEPARTMENT OF THE AMERICAN FEDERATION OF LABOR, BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES et al., Interveners).

No. 3190.

District Court, E. D. Missouri, E. D.
July 17, 1946.

R. B. Elster, of St. Louis, Mo., for Wabash R. R. Co.

Harry C. Blanton, U. S. Dist. Atty., of Sikeston, Mo., and Russell Vandivort, Asst. U. S. Dist. Atty., of St. Louis, Mo., for James P. Finnegan, Collector.

Clarence T. Case, of St. Louis, Mo., and Mulholland, Robie & McEwen and Richard R. Lyman, all of Toledo, Ohio, for intervening defendants.

**95**

HULEN, District Judge.

This cause, to recover taxes paid under protest to defendant by plaintiff, alleged by defendant to be due under the Federal Unemployment Tax Act, 26 U.S.C.A. Int.Rev. Code, § 1600 et seq., and the Carriers' Taxing Act of 1937, 45 U.S.C.A. § 261 et seq. (hereinafter referred to as "Act") was tried on stipulation of facts, exhibits, and deposition of one witness.

The controversy results from the practice of plaintiff in contracting with J. M. Farrin and Company (called "contractor") in connection with work on plaintiff's railroad. The contracts, twenty in number, bear various dates from 1927 to 1940 (Exhibits "B" to "W"). Workmen, whose employment is the subject of this suit, are those who performed the services described in the contracts. Plaintiff's position is—under the contract between it and contractor, the contractor was an "independent contractor," and the persons employed by it to do the work called for by the contract were contractor's employees and not plaintiff's. Defendant's position is the contrary —that the employees executing the work called for by the contract, under the terms of the Act were plaintiff's employees.

The contract between plaintiff and the contractor (Exhibit N) for the operation at Tracy, where the services were performed by one Cormicle, provided, for a monthly consideration, that the contractor would unload and place in the coal chute of the plaintiff all coal required by plaintiff at its Tracy, Iowa, coal station; perform a like service as to sand; and watch plaintiff's locomotives which tied up at Tracy, the latter for a consideration "per engine per day." Contractor "agrees to care for and prepare such locomotive * * * for transportation train service * * * and such necessary attention as is usually given lay-over locomotives * * *, watching, cleaning, firing, sanding, wiping, etc., putting on and taking off of engine supplies and caring for same while not on the locomotive." The contractor agreed to keep grounds around the coal chute and engine room in neat and tidy condition and prevent injury to locomotives by reason of fire or low water in

locomotive boilers. Plaintiff agreed to furnish free transportation to the contractor, and give contractor free use of railroad mails and telegraph lines. In event the service of the contractor is not satisfactory, plaintiff could declare the contract "null and void forthwith." Contractor is stated to be "an independent contractor." The contract had no termination date; either party could terminate on two days' notice.

Plaintiff made a "sub-contract" with Cormicle (Exhibit "A"), providing the sub-contractor (Cormicle) would perform all "the duties and obligations" of the contract between plaintiff and contractor. The sub-contractor was paid on the same basis but a less amount than the contractor received from plaintiff.

Cormicle testified by deposition. He worked from 1931 to 1939. He was employed and paid by the contractor. Some years after employment started, the contractor submitted a written contract for his signature. He was not consulted about its terms. Plaintiff maintained the Tracy coal chutes into which coal was hoisted from coal cars for the purpose of coaling engines operating over plaintiff's line. The witness removed the coal from the coal cars into the bins from which the engines received the coal. He also watched engines and pumped water into a tank "to wet down the coal * * * to keep the dust down." The water was pumped by hand "the first year," then a gasoline engine was installed. "I took care of that." Engines used to pull the coal cars were taken care of by the witness on orders from "the railroad company." These engines would "tie up there in the evening," and the witness would "have it ready for them to go to work in the morning and get it coaled." On some occasions he helped with switch operations on the engine used to haul coal. "I would fire the engine for him there and throw the switches for him a part of the time." This was while some of the crew were at lunch. This operation happened "quite often." Plaintiff would set as many as fifteen cars on the track above the coal chute and the witness would "cut them off and pinch them into the chute," one at a time, so they could be unloaded "over the pit." The witness also handled sand. The sand was unloaded into a bin by "section crew" then the witness "would dry it" by shoveling it into a steel drum where it was screened down "into the pit" from which it was blown into the "sand bin up under the chute" by an air compressor, and from the chute "it would be delivered to the engine." The witness ran the motor connected with the air compressors. Work of "watching engines" included "keep it clean and build the fires * * have it ready for the crew by morning, fire up. Have to have steam up in the morning at six o'clock. * * * When they got through the work they turned them back to you and you have to look after it all the time. Clean the fire and clean the chute, bank the fire * * * watch them over night in cold weather to keep it from freezing * * * keep it in a neat condition, wipe the windows of the cab and the jacket of the engine * * * oil and fill the lubricator." The witness said firing the engine was not a part of his contractual obligation, but he was asked to do it, "and I did." The witness stated he did some work watching engines "out on the road." This the Wabash paid him for. He objected to pumping water, claiming it was outside of his contract, and made demand upon plaintiff for compensation. None was paid to him. Representatives of the contractor visited the place of the witness' work "probably averaged twice a year." Such representatives "hardly ever" gave the witness any instructions as to how he "should do the work there." He made reports to the plaintiff on watching "extra engines." Representatives of the plaintiff inspected the coal dock at the coal chute, gave the witness "orders" on operation of the coal chute. Plaintiff sent the witness written communications directing him to do certain work, and these were complied with. Plaintiff told the witness what time to be at the coal chute for certain trains, and the witness complied. He never refused "to do any work" that any "representatives of the plaintiff asked him to do." All work was performed on the premises of the plaintiff and the witness was not restricted as to places he could go on plain-

tiff's property. The physical facilities for pumping water, coaling engines and supplying sand belonged to plaintiff. The contractor furnished "no tools whatever," nor any supplies "of any kind." In the case of any break-downs on the coal chute, he reported to the plaintiff, and the plaintiff made the repairs, except when it was something the witness could repair himself.

The Tracy, Iowa, contract and the testimony of Cormicle call for special attention because of stipulation that all of the "employees" involved would testify, if called, that "they performed all of the services which were provided for in the contracts" between the contractor and plaintiff "in the same manner and under the same circumstances" as Cormicle relates in his testimony, "it being understood the relationship between the Wabash" and the employees in question was "the same as the relationship between the Wabash and Mr. Cormicle as testified in his deposition, except as the relationship was varied by the duties required under the terms of the contract." As we interpret this stipulation, while plaintiff entered into separate contracts with respect to work at different points on its road and separate contracts with respect to different character of services at the same point on its road, yet insofar as the manner and circumstances of the work being performed and the relationship between the workmen and the plaintiff, the contracts are to be construed as one. As the parties present their case, the tax sued for is valid in its entirety or invalid in its entirety.

One contract (Exhibit "U") between plaintiff and the contractor executed December 5, 1940, provided, for a monthly consideration, the contractor would "act as a messenger on locomotives being towed (by plaintiff) between the Council Bluffs Round House and the Union Station in Omaha, Nebraska." The messenger was to maintain water in the boiler between the points mentioned, "have fire properly conditioned to be immediately revived" on arrival at Omaha, "see that lubrication is working at all times when locomotive is moving between the points." "After locomotive is set at Omaha Union Station,

contractor will see that * * * water * * * maintained in boiler at all times, fire conditioned, steam on boiler as required by the engine crew." Paragraph third of this contract required the contractor "to have the locomotive or locomotives in proper condition for service at the regular starting time." This contract was subject to termination on option of plaintiff. This contract, like all contracts involved, except one, provided, "it is expressly understood and agreed that in the performance of the service contemplated under this contract, the contractor shall be deemed and held to be an independent contractor, and the Wabash reserves and holds no control over him except as to the results to be accomplished hereunder." Contract for service at Columbia, Missouri, provided that for a monthly consideration, the contractor was to place all coal on locomotive tenders "concerned in the assignment termed the Columbia branch operating in and out of Columbia, Missouri * * * in sizes and quantities suitable for firing of locomotives and to meet the requirements of the Wabash at all times at its Columbia, Missouri, terminal;" "to assist other employees in pushing the turn tables and turning engines." Six contracts were executed by the contractor and plaintiff for service at plaintiff's Moberly Division Point (Exhibits "E", "F", "G", "H", "I", and "S"). Taking the oldest contract first (Exhibit "E"), it provided for an adjustment and transfer of freight from "certain bad order freight cars to other freight cars" on plaintiff's track at Moberly. The contract calls for placing of loads in cars as well as transfer and "recooperage" of any package which may be damaged. Compensation was based on so much per car. By Exhibit "F" the parties amended Exhibit "E" to include the cleaning of "coal cars furnished for loading by plaintiff at a mine near Huntsville." Exhibit "G" again amended Exhibit "E" by including additional services to be performed by the contractor, to-wit, "clean such A.R.T. cars at Moberly, Missouri, as the Wabash may desire to have cleaned." By Exhibit "H", Exhibit "E" was again amended to add the cleaning of such stock cars of the Wabash at Moberly, Missouri, as and when

the Wabash may desire to have same cleaned. Exhibit "I" covered the "unloading of cinders from cars at Moberly, Missouri," into storage piles at a fixed price per car. (This is the only contract in which we fail to find the independent contractor clause.) Paragraph three provides all work shall be performed in a "manner satisfactory" to plaintiff. By Exhibit "S" contractor agreed to unload coal required by plaintiff at Moberly, same to be placed in coal chutes. The contract followed the same conditions of the contract covering work at Tracy, including the drying and hoisting of sand into bins provided by plaintiff to supply the needs of plaintiff for such sand. The contract at Stansbury, Missouri (Exhibit "K") called for the contractor to clean and sand stock cars "when and as desired by the Wabash; also the contractor shall operate the pump for furnishing of water at Stansbury." Compensation was based on a per car basis for cleaning and sanding stock cars and a monthly compensation for operating the water pump. A further contract relating to the same location (Exhibit "L") amended Exhibit "K", the contractor agreeing to "straw bed" stock cars at the same location. Compensation was on a per car basis. The Council Bluffs, Iowa, contract, (Exhibit "J") provided the contractor would clean, wash, sand and disinfect stock cars "when and as directed by the Wabash." Compensation was on a car basis and the compensation section of the contract included compensation for "unloading sand" and unloading trash cars. The Hannibal contract (Exhibit "T") was for coaling and furnishing sand, and is similar to provisions of the Tracy contract. This is also true of the contract for Millard (Exhibit "B"), contract for Moulton (Exhibit "C"), and contract for Springfield, Illinois (Exhibit "D"). (Exhibits "N", "O", "P", "V", and "W" relate only to increasing compensation, and are not material to the issues.)

Certain provisions were similar in more than one contract. Exhibits "F", "G", "H", "K", "L", and "J" called for "furnishing the labor." Exhibits "E", "D", "U", "T", "C", "B" and "N" called for performance "of labor" or services or specific work. Exhibits "E", "D", "T", "C", and "B" required plaintiff to keep the records which determined contractor's compensation. Exhibits "S", "D", "E", "T", "K", "J", "T", and "B" required the contractor to furnish tools. Exhibits "H", "I", and "E" required the contractor to furnish equipment. Exhibit "D" required plaintiff to furnish bunk cars for workmen. By Exhibits "S", "D", and "T" the contractor was required to make frequent inspections. Exhibit "E" called for both parties to make repairs. By Exhibits "C", "S", "E", and "F", the contractor was to provide supervision. Plaintiff was privileged to cancel contract if work not satisfactory in Exhibits "E", "S", "D", "U", "K", "J", "T", "C" and "B", otherwise the contracts continue indefinitely. Contractor agrees to protect plaintiff's property from damage to engines, equipment, and so forth, by Exhibits "E", "D", "U", "T", "C" and "B". Exhibits "E", "S" and "O" required contractor to care for parts of plaintiff's premises. Use of plaintiff's mail, telegraph and pass privileges are called for by Exhibits "E", "S", "D", "U", "O", "T", "C" and "B". All contracts contained a requirement, broad in terms, that contractor assumed all risk and would protect plaintiff from all claims growing out of work, and with one exception all provided contractor was an independent contractor and plaintiff had no control over work except as to result.

■ This action being one for the recovery of taxes paid, the burden is on plaintiff taxpayer to prove facts establishing the illegality of the tax paid. *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347. Determination of the question presented turns on whether the workmen employed to perform the service provided for in the contracts between plaintiff and contractor were "subject to the continuing authority of the" plaintiff "to supervise and direct the manner of rendition of" the employees' "service * * *." Title 45, U.S.C.A. § 261(d).

■ The Carriers' Taxing Act of 1937 is not strictly a revenue measure, but is in connection with, and has for its ultimate purpose, providing retirement com-

pensation for employees of carriers. The Act, therefore, has a social purpose. That purpose cannot be ignored when applying its terms to this case. National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, loc. cit. 127, 64 S.Ct. 851, 88 L.Ed. 1170. The common law rules for determining employee relationship where the question of independent contractor is injected do not apply in a case under a law of the character the Court is called upon to interpret in this case. The rule is stated in U. S. v. Vogue, 4 Cir., 145 F.2d 609, loc. cit. 612: "Common law rules as to distinctions between servants and independent contractors throw but little light on the question involved. The Social Security Act [42 U.S.C.A. § 301 et seq.], like the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was enacted pursuant to a public policy unknown to the common law; and its applicability is to be judged rather from the purposes that Congress had in mind than from common law rules worked out for determining tort liability."

Approaching the relationship between plaintiff and the workmen involved, in light of the purpose of the Carriers' Taxing Act, a prime consideration in determining if the workmen in question were subject to the continuing authority of the plaintiff to supervise and direct the manner of performance of service is the nature of the services which were performed. Were they of a character plaintiff could delegate and place beyond its control and still claim to operate its railroad and its carrier activities? The services were performed on plaintiff's premises, with the workmen under no restrictions as to where they could go on plaintiff's premises. Plaintiff furnished them with passes, and they used plaintiff's mail and telegraph service. All tools, machinery, and appliances belonged to the plaintiff. Some of the appliances such as coal chutes, motors, and sand elevators were expensive equipment, requiring care in operation and maintenance. If the contractor possessed any equipment to carry on the services contracted for, such does not appear in the record. The contractor furnished nothing but workmen. Some of the contracts called only for "workmen" to be furnished to perform certain kinds of services. Services called for, with but minor exception, related to operations integrated with the necessary business of plaintiff as a carrier and without which it could not operate as a carrier. The services were a functional part of plaintiff's business as a carrier. Unless the services were performed efficiently, plaintiff could not operate efficiently. When repairs were needed, the plaintiff was called upon to make them. Plaintiff kept records which were the basis of the contractor's compensation. If plaintiff can shed itself of its responsibility under the Carriers' Taxing Act for employees who perform services of the character covered by the contracts offered in this case, on the theory the services are being performed by an independent contractor, the purpose of Congress in passing the Act can well nigh be destroyed. As said in Despatch Shops v. Railroad Retirement Board, 80 U.S.App.D.C. 374, 153 F.2d 644, 646: "It is conceivable that everything from maintenance-of-way through engineering or bookkeeping might be done by so called 'independent' corporations. The application of this Act and of the other Acts passed for similar purposes and embodying the same language could be so severely limited as to render them of little worth in achieving the purposes for which they were passed."

In 39 C.J., p. 38, a general rule of law which we consider applicable to the facts in this case is stated: "If, however, the employer retains or assumes control over the means and method by which the work of a contractor is to be done, the relation of master and servant exists between him and servants of such a contractor, and the mere fact of nominal employment by an independent contractor will not relieve the master of liability where the servant is in fact in his employ."

What are the facts as to the exercise of continuing authority over the workmen and supervision of their services? All the contracts except one state with particularity that plaintiff shall have no control over the work but only as to the final result, and that the contractor is an independent contractor, yet every contract with this provision in it, with but two exceptions, pro-

ceeds to nullify the effect of the terms by providing in equally specific language that if the services are not performed to plaintiff's satisfaction, plaintiff may nullify the contract. A more effective means of lodging control in the plaintiff could not have been devised than the power of cancellation. See Henry W. Cross v. Burns, 8 Cir., 81 F.2d 856, loc. cit. 861; also Jones, Collector of Internal Revenue v. Goodson, 10 Cir., 121 F.2d 175. The contractor neither supervised nor attempted to supervise, exerted authority nor attempted to exert authority over workmen in the performance of the services. Three of the contracts in express language required the contractor to do so. Contractor's representatives visited the scene of operations only once or twice a year. Could services of the kind called for by the contracts be performed without supervision? We cannot believe such to be the case. So who did the controlling and supervising? All of the control, supervision and authority exercised over the workmen was by plaintiff. It directed the workmen, to no less an extent than had it employed them and carried them on its payroll. The nature of services to be performed was such that the plaintiff could not surrender control and supervision in fact, even if it did so in words. Plaintiff and the contractor, by their conduct, gave a necessary practical construction as to the instruments signed by them. This construction is entitled to great weight in determining the proper interpretation to be placed upon the contract. 13 C.J. 546, § 517; Laclede Construction Co. v. T. J. Moss Tie Co., 185 Mo. 25, 84 S.W. 76; City of St. Louis v. Laclede Gas Light Co., 155 Mo. 1, 55 S.W. 1003.

The character of service should be noted in another connection. Following the language which declares the contractor to be an independent contractor, the contracts provide plaintiff shall hold "no control * * * other than as to results to be accomplished * * *." Plaintiff likens the contract to one by a contractor to build a house. What are the end or ultimate "results" to be accomplished in the turn table operations, the coaling of engines, the watching of engines, the transfer of freight from bad to good cars and recrating it, or the trip of the messenger with the engine? These services impress the Court as being of a continuing nature, as distinguished from a contract for a definite "result," such as building a house, where an end of service or finished product is contemplated by the contract. No definite end was contracted for in the agreement between plaintiff and the contractor. With one exception, the contracts expressly provided they were to run indefinitely.

■ Commonly recognized tests of the relationship in issue are found in the cases. They are: (1) Is there a contract for the performance of a certain piece or kind of work at a fixed price? (2) Does the contractor have an independent business and a distinct calling for doing the work? (3) Does the contractor supervise the work? (4) Does the contractor furnish necessary tools, supplies, and materials? (5) Does the contractor have exclusive control of the progress of the work, responsible only for the final result? (6) The time for which the contract is to run. (7) Method of payment. (8) Whether the work is part of the regular business of the employer. Murray's Case, 130 Me. 181, 154 A. 352, 75 A.L.R. 720; Determining Employer-Employee Relationship in Social Legislation, 41 Columbia Law Review 1015. So tested, we doubt if plaintiff's independent contractor theory could survive, even under the common law rule. As we have observed, the contracts were continuing contracts, as long as the services were satisfactory; the services were not in furtherance of any independent trade or business of the contractor; plaintiff claims it had like contracts with other roads, but there is no substantive proof of such claims; if the contractor had any investment in the enterprise there is no proof of it; plaintiff even was required to keep the contractor's pay basis records by some of the contracts; the contractor furnished no supervision of performance of service; the contractor furnished no tools; he invested no money in this respect in the enterprise; all control was exercised by the plaintiff and many of the contracts in express language recognize that plaintiff would give directions with reference to the work. Contractor was paid on a cost plus

basis. The work was a part of the carrier operations of the plaintiff.

Had injury been suffered as a result of performance of services by workmen carrying out the duties called for by the contracts, could plaintiff defend itself by asserting that the service or the act causing the damage was performed by an independent contractor? If freight was lost or damaged by reason of change of cars or re-cooperage under the Moberly contract, would plaintiff be heard to say in excuse of the loss sustained that the negligence was that of an independent contractor? Plaintiff, not unmindful of its position in this regard uniformly required the contractor to furnish liability insurance protecting it from loss in such cases. If the turn table operators, engine watchers, engine messengers, coal chute operators, or car cleaners went on strike, would it affect transportation by the carrier? These questions point unerringly to the conclusion that the services performed were an integral part of the carrier's operation.

That the contractor was an independent entity from the plaintiff does not lessen the evil of the practice presented by the facts in this case, viewed from the standpoint of the purpose of the legislation of the Carriers' Taxing Act. Aside from the saving of 2% of the amount of wages received by the workmen, being the difference between the amount contractor would be liable for under the Social Security Act, and the amount plaintiff would have to contribute under the Carriers' Taxing Act, and other employer responsibilities, we can see no motive for the use of the contracts resorted to by plaintiff. But regardless of motive, such contracts cannot serve to prevent fixing of the tax on the substance of the relationship, rather than the name the parties choose to give it. See Matcovich v. Anglim, 9 Cir., 134 F.2d 834, loc. cit. 837:

"However, we think the following from Griffiths v. Commissioner [Helvering], 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed. 319, is applicable:

"'* * * Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed * * *.

Taxes cannot be escaped "by anticipatory arrangements and contracts however skilfully devised * * * by which the fruits are attributed to a different tree from that on which they grew." Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731. * * *'

"In view of the intention to tax when the control of one party over others was as great as is disclosed here, we think the license agreements should not be permitted to prevent the tax."

■ We conclude the plaintiff has failed to sustain its burden of proof. The individuals supplying the services in relation to the business of plaintiff under contracts between plaintiff and J. M. Farrin and Company were employees of plaintiff, under the Carriers' Taxing Act.

Findings of Fact, Conclusions of Law, and Order may be presented accordingly.