Richard Downs, Appellee, v. The Baltimore and Ohio
Railroad Company, Appellant.

Gen. No. 44,899.

Opinion filed November 27, 1951. Rehearing denied January 2, 1952. Released for publication January 3, 1952.

JAMES F. WRIGHT, and E. W. LADEMANN, CHARLES F. WHITE, all of Chicago, for appellant; FAY WARREN JOHNSON, of Chicago, of counsel.

JOSEPH D. RYAN, LOUIS P. MILLER, and ARTHUR RYAN, all of Chicago, for appellee.

MR. PRESIDING JUSTICE TUOHY delivered the opinion of the court.

Defendant, Baltimore & Ohio Railroad Company, appeals from a $75,000 judgment entered against it in favor of plaintiff, Richard Downs, upon a jury verdict for personal injuries in an action brought

under provisions of the Federal Employers' Liability Act.

The accident happened on the night of May 24, 1947, while the boat S. B. Way, carrying ore consigned from Duluth, Minnesota, to American Rolling Mill in Hamilton, Ohio, was being unloaded for cargo transfer on defendant's docks at Toledo, Ohio. The ore was unloaded from the holds of the vessel by a clamshell-like device known as a Hulett machine. This contrivance lifted and dumped the load into an overhead hopper. Under the hopper was another device, known as a Larry car, operated on a gravity track, which dropped the ore into railroad cars on any one of four parallel tracks below. Shortly before the accident a shaft broke in an ore receiving hopper, so that the dumping of ore from the hopper into the Larry car could not be controlled, and as a result the car was overloaded about 5,000 pounds. Upon instructions of his foreman, the plaintiff got into the Larry car with the operator, who moved the car to a position underneath the hopper to see what was wrong. In order to stop the car on the inclined tracks it was necessary to set the brakes. Plaintiff had gotten out of the Larry car and was straddling one of the rails on which the Larry car was operated and was engaged in assisting in repairing the broken machinery. The operator moved the Larry car a few feet up the track, stopped it and applied the brake, but the brake did not hold and the Larry car moved back, struck the plaintiff and caused him to fall 20 feet to the tracks below.

The theory of plaintiff is that, although a nominal employee of the Toledo, Lorain & Fairport Dock Company, he was actually an employee of the defendant; that the dock company was a mere agent of defendant and the agreement by which it was sought to effect an independent contractor relationship between the

defendant railroad company and the dock company was a scheme to enable the defendant to evade its responsibility to its employees in violation of section 5 of the Federal Employers' Liability Act. The theory of defendant is that the dock was leased to the dock company; that the dock company had exclusive control of and operated it through its own employees, one of whom was plaintiff. It is further contended by defendant that at the time of the injury plaintiff was not engaged in interstate commerce; that the verdict is excessive; and that erroneous instructions were given to the jury on behalf of plaintiff.

Inasmuch as defendant rested on its motion for a directed verdict at the close of all the evidence offered on behalf of plaintiff and offered no evidence on its own behalf, the principal questions in the case, namely, whether or not plaintiff was an employee of an independent contractor and whether or not plaintiff at the time and place of the accident was engaged in interstate commerce, were treated by the trial court as questions of law.

█ Recovery under the Federal Employers' Liability Act is limited to employees of a carrier by railroad while engaged in interstate commerce. We quote the pertinent portion of the statute here involved (45 U. S. C. A. sec. 51):

''Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

"Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."

Section 5 of the Act (45 U. S. C. A. sec. 55) provides:
"Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void . . . ."

██ ██ The question as to whether plaintiff at the time and place of the accident was the servant of defendant or of an independent contractor depends, of course, upon whether the dock company was a bona fide contractor or a mere instrumentality of defendant—a straw man without legal life of its own. We think the rule which should govern this character of case is well stated in 39 C. J., pp. 37, 38, as follows:

"The relation of master and servant does not exist between an employer and the servants of an independent contractor . . . . If, however, the employer retains or assumes control over the means and method by which the work of a contractor is to be done, the relation of master and servant exists between him and servants of such a contractor, and the mere fact of nominal employment by an independent contractor will not relieve the master of liability where the servant is in fact in his employ."

In order to determine whether or not the defendant here retained and assumed control over the means and method by which the work of the dock company was done, a careful review of the evidence is required.

122

Prior to April, 1935, the dock in question was operated by defendant through its regular employees. By agreement dated April 5, 1935, the defendant turned over to the dock company, without compensation, its ore dock and equipment worth over a million dollars, transferred its employees to the dock company's payroll; and without substantial change in the method of operation the dock company proceeded to do the work which had theretofore been done by defendant and which was a necessary part of the transportation service furnished by defendant to its shippers. The unloading docks where the operation occurred out of which the accident arose, were owned by defendant. The tracks underneath the loading apparatus where plaintiff was injured were owned and controlled by defendant. The machinery which was being operated at the time of the accident, as well as all other machinery involved in the unloading operations, was owned by defendant. Access to the dock where the work was being performed could be obtained only over defendant's property. The defendant reserved the right of a joint inspection of the property with the dock company and the right to take annual inventories of spare parts at the dock for ore handling machinery; and the costs of maintenance and operation were to be paid out of gross receipts.

The ore which was being unloaded at the time of the accident was part of a shipment bound from Duluth, Minnesota, to Hamilton, Ohio, and the unloading operations were being carried on in part by workmen who operated the unloading apparatus for the dock company and in part by regular employees of the defendant who spotted the cars for loading and pulled them away when loaded. The work of unloading, a transfer operation from boat to rail between defendant's terminals, was done under written orders from

defendant which specified the number and type of cars the ore was to be loaded into, the tonnage of the boat, and the destination of the ore.

Under the 1935 agreement, expenses of operation and maintenance were paid out of gross receipts, and the dock company received a management fee of $30,000, after which $112,000 of the remainder of the earnings was required to be paid to the defendant; and the balance, if any, was to go to the dock company. The defendant was to collect all sums due for services rendered. In April of 1938 there was a modification of the 1935 agreement to give the defendant the benefit of an increase in the rates for dock-handling services. This increase was allowed by the Interstate Commerce Commission, and it appears that the defendant alone benefited by this increase in rates.

On January 1, 1947, the dock company and defendant entered into a new contract (under which they were operating at the time of plaintiff's injury) which, while it did not provide for any substantial changes in the method of operation, made certain changes in the financial arrangements between the parties. Under this agreement profits after the payment of the $30,000 management fee, up to $127,000 per year, were to be paid to defendant, and defendant was to collect all sums due for services rendered. The dock company's cost of insurance for liability for injuries to employees was included as a part of the expenses of operation and maintenance which were deducted from total gross receipts from the dock operations before stipulated payments were made therefrom to the dock company and defendant. Taxes on the property were paid by defendant, as were insurance premiums for indemnity against loss or damage by fire, windstorm or explosion. Defendant further agreed to the payment of employees' wages as a part of operating expenses and that the dock company was to make such

further deductions from wages as might be required by any federal, state or local law and save the defendant harmless from any claims in respect to such deductions.

Valuation reports of the Interstate Commerce Commission indicate that the defendant included the docks in question in its property account as a basis for computing its freight rates. It thus appears that defendant alone had control over charges to be made for the service, which charges were to be the same as those for similar services at other lake ports and which were required to conform to tariffs where applicable.

Under the 1947 agreement the dock company was required to submit to defendant monthly tonnage statements and to keep accurate and detailed accounts of its operations, which were to be open to defendant for inspection at all reasonable times. *Defendant paid the costs of operation and maintenance which included the wages of plaintiff and the other employees operating the facilities.* The dock company was further required to submit monthly expense statements and a list of items chargeable to operation and maintenance, leading to the conclusion that defendant intended to and did reserve to itself the final word as to what expenditures should be made. It is also to be observed that the agreement provided that the dock company was to transfer such bulk freight other than coal and ore as the defendant might desire from time to time. Particularly significant upon the right of control exercised by defendant over the dock company is the fact that the contract provided for termination by the dock company upon five years' notice, but for termination by defendant upon only thirty days' notice for failure of the dock company to perform any of its covenants.

Finally, it appears that no employment of the dock company by anyone other than defendant was per-

■■■■■■■■

■■■■■■■■

missible under the agreement. The dock company could use the facilities of defendant for the transfer of coal, ore and other freight between vessels and defendant's cars only, but was forbidden to sublet the property or assign the lease without defendant's written consent.

■■ From our review of this evidence we have reached the conclusion that the work upon which the plaintiff was engaged at the time and place of the accident was actually the work of defendant and not the work of the dock company. We have concluded that the dock company was a mere agency of defendant and that consequently plaintiff was an employee of defendant. We are further of the opinion that to recognize the dock company as an independent contractor would have the effect, so far as plaintiff is concerned, of permitting defendant to exempt itself from liability created by the Federal Employers' Liability Act.

The conclusions which we have reached find support in many cases. *Cimorelli v. New York Cent. R. Co.,* 148 F. (2d) 575 (C. C. A. 6th); *McComb v. McKay,* 164 F. (2d) 40 (C. C. A. 8th); *Erie R. Co. v. Margue,* 23 F. (2d) 664 (C. C. A. 6th); *Wabash R. R. Co. v. Finnegan,* 67 F. Supp. 94; *Pennsylvania R. Co. v. Roth,* 163 F. (2d) 161 (C. C. A. 6th); *Pennsylvania R. Co. v. Barlion,* 172 F. (2d) 710 (C. C. A. 6th); *Gulf Refining Co. v. Rogers* (Tex. Civ. App.), 57 S. W. (2d) 183; *Maxwell v. Shell Eastern Petroleum Products,* 90 F. (2d) 39 (C. C. A. 4th); *Standard Oil Co. v. State Board of Equalization,* 110 Mont. 5, 99 P. (2d) 229; *Standard Oil Co. v. Anderson,* 212 U. S. 215; *Atlantic Coast Line R. Co. v. Tredway's Adm'x,* 120 Va. 735 (certiorari denied 245 U. S. 670); *Wegman v. Great Northern Ry. Co.,* 189 Minn. 325; *Baltimore & Ohio R. R. Co. et al.,* 42 Val. Rep. (I. C. C.) 1, 53, 54;

*Union Stock Yard & Transit Co. v. United States,*
308 U. S. 213. Space permits an analysis of but a few.

In *Cimorelli v. New York Cent. R. Co.,* 148 F. (2d)
575 (C. C. A. 6th), the railroad company contracted
with the United States to provide a storage space for
war materials in transit and to unload and reload the
materials in accordance with government specifica-
tions. The company in turn employed a subcontractor
to do the work, the contract expressly providing that
the latter was to be an independent contractor and was
to have exclusive supervision of the manner and meth-
od of performing the work. It was held that the plain-
tiff, hired by the so-called independent contractor, was
an employee of the railroad company, the court finding
that the business to be performed was in reality the
business of the railroad company and not of the in-
dependent contractor, stating (p. 578):

"The employment of Duffy Company was general;
many or few cars were to be unloaded or reloaded
according to the demands of the business. The work
was to be done when, where and in the proportions as
the needs of appellee [the railroad company] might
justify. It is therefore manifest that through appel-
lee's superintendent, full control over the means and
manner of performance of the contract was reserved
to appellee and that there was left in the contractor
no independence."

In *McComb v. McKay,* 164 F. (2d) 40 (C. C. A.
8th), it was held that employees engaged in a yard
maintained on the railroad right of way for the manu-
facture, repair and storage of temporary grain doors
and coal doors for freight cars were employees of the
railroad and not of the contractor who hired them.
The following language is particularly applicable to
the case under consideration (p. 49):

"The work is done in conformity with the railroad's
directions and specifications, on the railroad's prop-

127

erty, and with the railroad's materials and equipment. The McKays' investment in the work is negligible, consisting of the $500 tractor purchased for their convenience in moving freight cars. The contribution of the McKays is the management necessary to operate the yard.''

In *Erie R. Co. v. Margue,* 23 F. (2d) 664 (C. C. A. 6th), a suit for injuries was brought by an employee of a construction company against the railroad company under the Federal Employers' Liability Act. The construction company undertook with its own employees to maintain the tracks, roadway and structures of the railroad company, and the latter company agreed to furnish tools and equipment. The contract was to continue for a year, and either party could terminate it on thirty days' notice, but the railroad company could terminate it and take possession and control of the work upon twenty-four hours' notice, if in the judgment of its general manager such termination was desirable or in the interest of the company. Basing its decision in large part upon this cancellation provison of the contract, the court held there was no real independent relationship set up, but that the construction company was merely an adjunct of the railroad company. A similar cancellation clause is present in the instant case.

*Wabash R. R. Co. v. Finnegan,* 67 F. Supp. 94, held that supplying sand and coal and servicing the railroad's engines, under a contract intended to create an independent contractor relationship, were integral parts of the railroad's operations so as to make the persons furnishing these services the railroad's employees. In that case it was pointed out that the services, instead of being those which called for the accomplishment of a definite result, such as the building of a house where an end of services by a finished product is contemplated by the contract, were of a con-

tinuing nature; that the services were to be performed so long as satisfactory; that the contractor had no capital investment in the enterprise with respect to property or tools and that he was to be paid on a cost plus basis. These considerations are applicable to the instant case.

To substantially the same effect are the cases of *Pennsylvania R. Co. v. Roth,* 163 F. (2d) 161, and *Pennslyvania R. Co. v. Barlion,* 172 F. (2d) 710.

█ Defendant contends that on plaintiff's testimony alone it was entitled to a directed verdict, having particular reference to that portion of the testimony wherein plaintiff stated that he was employed by the dock company; that the dock company paid him and no other company did; and that the work he was doing was directed by a foreman of the dock company. We think that this argument begs the question. It is true that plaintiff was a nominal employee of the dock company and it is also true that the agreement under which the dock company operated designated said company as an independent contractor. However, where a question arises as to what the real relationship between parties is, the courts are not bound by the conclusions of witnesses or the terminology of agreements attempting to characterize the relationship, but the form of the agreement must yield to its essence. Courts will look to all the circumstances of the transaction, and the employer will in the final analysis be the one whose work is being performed and who has the power of control over the work and the employee. *Union Pacific Ry. Co. v. Chicago, R. I. & P. Ry. Co.,* 163 U. S. 564, 582; *Rutherford Food Corp. v. McComb,* 331 U. S. 722; *Cimorelli v. New York Cent. R. Co.,* 148 F. (2d) 575.

Defendant seeks to substantiate its argument by cases which it contends establish that the Federal Employers' Liability Act contemplates the conventional

129

relation of employer and employee and master and servant, and that the testimony here admittedly proves that such conventional relationship existed, relying upon *Robinson v. Baltimore & Ohio R. Co.,* 237 U. S. 84; and *Hull v. Philadelphia & Reading Ry. Co.,* 252 U. S. 475. While it is true that both of these cases say that in the Federal Employers' Liability Act the words "employee" and "employed" are used in the conventional sense, such holding was not necessary to the decision in either case, because the facts, aside from the characterization, established that the work there being done was the work of a bona fide independent contractor. Furthermore, the holding in JUDGE CLARKE's dissent in the *Hull* case is supported by eminent authority: *North Carolina R. Co. v. Zachary,* 232 U. S. 248; *Linstead v. Chesapeake & Ohio Ry. Co.,* 276 U. S. 28; *Lovett v. Calloway,* 69 F. Supp. 532; *Armstrong v. Chicago & W. I. R. R. Co.,* 350 Ill. 426 (certiorari denied 289 U. S. 724); *Erie R. Co. v. Margue,* 23 F. (2d) 664; *Wilson v. Terminal Railroad Ass'n of St. Louis,* 333 Ill. App. 256.

Defendant cites many cases wherein under facts which it contends are analogous plaintiffs seeking recovery under the Federal Employers' Liability Act were held not to be employees of the railroad company but of independent contractors. The question here involved being a factual one, analogous cases are not persuasive and in many instances not helpful. Space does not permit comment on each of the cases cited by defendant, but in our opinion there are facts and circumstances in each which tend to distinguish it from the case under consideration.

Emphatic reliance is placed by defendant upon the case of *Lees v. Chicago & N. W. Ry. Co.,* 339 Ill. App. 227, which defendant in its reply brief states to be controlling of the case under discussion. We draw no such conclusion from the *Lees* case, which is clearly

distinquishable on the facts. In that case the Deneen River Company was employed to drive certain pilings on both sides of the railroad company's bridge for the purpose of protecting the bridge from ship damage. The defendant's engineer testified that it was not equipped to do the kind of work that was done; that it had no river barges, derricks or pile drivers that would have enabled it to remove the old pile clusters; and that the work was done by employees of the independent contractor who had regularly done its work with companies other than the defendant. Furthermore, it is to be observed that in the *Lees* case the services were those which called for the accomplishment of a particular result, namely, the sinking of pilings. When that result was accomplished the contractor's work with the railroad company was finished, but in the instant case the services were of a continuing nature, to be performed for the railroad company in the furtherance of the railroad company's business and under the railroad company's supervision indefinitely. In the *Lees* case the railroad dealt with an established independent contractor, while in the instant case the railroad company dealt with one of its own instrumentalities which continued to do exactly the same work after as before its change of name.

Also distinguishable upon the facts are the cases of *Stevenson v. Lake Terminal R. Co.,* 42 F. (2d) 357; *Chicago, R. I. & P. Ry. Co. v. Bond,* 240 U. S. 449; *Klar v. Erie R. Co.,* 118 O. S. 612; *Reynolds v. Addison Miller Co.,* 143 Wash. 271; *Gaulden v. Southern Pac. Co.,* 78 F. Supp. 651; and *Drago v. Cent. R. R. Co.,* 106 Atl. 803.

The cases of *Pennsylvania R. R. Co. v. United States,* 70 F. Supp. 595, and *Martin v. Federal Securities Agency,* 73 F. Supp. 482, are analogous to the case under consideration insofar as they both involve companies performing stevedore services, which com-

131

panies were held to be independent contractors. However, inasmuch as they do not involve cases arising out of the Federal Employers' Liability Act we do not consider them in point on the substantial issue here involved. In analyzing the type of case before us we must not overlook the fact that the trend of federal decisions and congressional action, insofar as the Federal Employers' Liability Act is concerned, has been toward a liberalization and a broadening of the base of responsibility. The 1939 amendment to the Federal Employers' Liability Act (45 U. S. C. A. sec. 51), which extended the Act so that employees whose duties in any way directly or closely or substantially affected interstate commerce should be considered as employees for the benefits of the Act, is an example of the liberalizing intent of Congress. The Act has been so interpreted in *Urie v. Thompson,* 337 U. S. 163. We feel that to take language from opinions in cases between taxing bodies and employers and give it an effect which would tend to limit the rights of employees under the Federal Employers' Liability Act would in effect nullify the liberal application which Congress apparently intended it to receive.

We are not impressed by the argument of defendant that the plaintiff was not engaged in interstate commerce. The ore here in question was shipped from Duluth, Minnesota, by the Ogalbay Norton Company to the American Rolling Mill in Hamilton, Ohio. It was in transit, Toledo being an intermediate stop between the terminals and being the port at which the ore was transferred from the steamer to the railroad. The shipment of ore by boat to Ohio from another State, and then to a point within Ohio in pursuance of an arrangement made while the ore was first en route, constituted one shipment in interstate commerce. *Beam v. Baltimore and Ohio R. Co.,* 77 Ohio App. 419, and *Sherman v. So. Pac. Co.,* 34 Cal. App.

(2d) 490. Even though Toledo were the ultimate destination of the shipment, the employee was at the time and place in question engaged in unloading an interstate shipment, and such work has been held to be interstate commerce in many cases, among them being *B. & O. S. W. R. Co. v. Burtch,* 263 U. S. 540; *Pipal v. G. T. W. Ry. Co.,* 341 Ill. 320 (certiorari denied 283 U. S. 838).

██ ██ Complaint is made about several of plaintiff's instructions, the substance of the objections being that each of these instructions assumed that plaintiff was an employee of defendant and also assumed that both plaintiff and defendant were engaged in interstate commerce, whereas these questions should have been treated as questions of fact and submitted to the jury for determination. Questions of fact should be submitted to the jury only if the facts are in dispute or if different inferences may reasonably be drawn from undisputed facts. Defendant tendered an instruction at the close of plaintiff's case requesting the court to direct a verdict in its favor on the ground that plaintiff was not its employee, but offered no evidence raising any question of fact on this issue. The case was therefore tried on the theory that the questions of whether or not plaintiff was defendant's employee and whether or not plaintiff and defendant were engaged in interstate commerce were questions of law, and no error was committed in refusing the tendered instruction.

██ Complaint is made of the excessiveness of the verdict. Plaintiff was thirty-two years of age at the time of the injury. In the accident he sustained a compression fracture of the second lumbar vertebra, a compression fracture of the tenth dorsal vertebra, a fracture of the right transverse process of the fourth lumbar vertebra, a fracture of the sacrum, a fracture of the zygomatic arch (located in the face between the

temple and the cheek), and a rupture separating the frontal bone from the cheek bone. The fracture of the second lumbar vertebra was comminuted, occasioning a number of fragments. The disk between the first and second lumbar vertebrae was partially destroyed, and the fifth intervertebral disk was also involved. There was a minimal kyphosis (hunchback) present. The spinal injury caused pressure on the nerve roots coming out between the vertebrae, causing a disturbance of function. At the time of the trial, cystic fluid, which had to be removed from time to time with a needle, was still present. The muscles of the spine were rigid and spastic, and certain areas of anaesthesia were present. For a number of days after the accident plaintiff was unable to function normally. He was in a body cast for two and one-half months, and at the time of the trial was still suffering pain. The injury incapacitated him from following his usual vocation, and at the time of the trial was attending business college attempting to fit himself for clerical work. There was evidence of long protracted pain and suffering. The testimony on behalf of plaintiff is to the effect that his condition is permanent.

 In eight months of 1946 plaintiff earned $3,820.81. From January 1, 1947, to May 29, 1947, the date of the accident, he earned $1,480.95. Since that time wages on work similar to his have been increased. The damages are very high, but we do not believe they are so excessive as to justify our interfering. In *Princell v. Pickwick Greyhound Lines*, 262 Ill. App. 298, for comparable injuries a verdict of $75,000 was permitted to stand, and this court will take judicial notice that between the date that case was decided in 1931 and the present there has been substantial shrinkage in the value of the dollar. Without reviewing the many other cases, there seems to be sound precedent for affirming a judgment of this size.

Wherefore, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

Schwartz and Robson, JJ., concur.