John Barango, Appellee and Separate Appellant, v.
E. L. Hedstrom Coal Co., an Illinois Corporation,
Separate Appellee, Elizabeth L. Fitch, Adminis-
trator of the Deceased, d/b/a V. A. Fitch Motor
Service, Appellant.

Gen. No. 46,815.

First District, Second Division.

November 27, 1956.

Released for publication January 8, 1957.

119

120

Eckert, Peterson & Lowry, of Chicago, for appellant; A. R. Peterson, Harold W. Huff, and Herbert C. Loth, Jr., all of Chicago, of counsel.

James A. Dooley, of Chicago, for appellee-separate appellant.

Erwin H. Wright and James E. Hastings, both of Chicago, for separate appellee.

JUDGE McCORMICK delivered the opinion of the court.

This action was brought by the plaintiff, John Barango, to recover damages for injuries sustained by him allegedly resulting from the joint and several negligence of E. L. Hedstrom Coal Co. (hereafter referred to as "Hedstrom") and Elizabeth L. Fitch, administrator of the estate of Vernon A. Fitch, deceased, d/b/a V. A. Fitch Motor Service (hereafter referred to as "Fitch"). The case was tried before a jury, a verdict was returned in favor of the plaintiff for $75,000 against both defendants, and judgment was entered upon the verdict. The trial court sustained the motion of defendant Hedstrom for judgment notwithstanding the verdict, and entered judgment accordingly in favor of that defendant. At the same time the court denied both Hedstrom's and Fitch's motions for a new trial. From the judgment entered for the plaintiff against the defendant Fitch for $75,000, the latter takes this appeal. A separate appeal was also taken by the plaintiff from the order of the court sustaining defendant Hedstrom's motion for judgment notwithstanding the verdict and from the judgment in favor of Hedstrom entered by the trial court.

The case grew out of an accident occurring on November 30, 1949. The plaintiff Barango, a self-employed cab driver, stopped his cab on the north side of Lawrence Avenue, in Chicago, facing west, just ahead of the cab of one Seiff. He went back to Seiff's cab to talk to him, and while he was standing at the left door of Seiff's cab (the door towards the street), he was struck by a coal conveyor apparatus belonging to Hedstrom, which had broken away from a six-wheel coal dump truck going west on Lawrence Avenue to which it had been attached. The truck was owned by Fitch and at the time was being driven by an employee

123

of Fitch who had been in her service for about three weeks and who had previously worked for Hedstrom as a driver. With the driver in the truck was a coal hiker employed by Hedstrom.

Hedstrom in 1949 owned its own trucks but occasionally when extra trucks were needed hired them from Fitch. The practice was that Fitch's drivers would report in the morning to pick up a truck. Fitch usually the night before notified the driver as to what truck he was to take, where he was going, and whether he would be hauling coal, dirt, crushed stone, or something else. When the driver went to Hedstrom's he would get a slip from someone there, which would designate how much coal was to be delivered, the address of the customer, and whether the coal was to be carried by conveyor or otherwise. The driver would not know any of these facts until he arrived at Hedstrom's. The driver of the truck involved had driven coal trucks for two or three years and was familiar with the way hitches connecting a conveyor to the truck would operate. He had been sent to Hedstrom's on prior occasions but had not previous to the day in question hauled a conveyor with a Fitch truck, although he had with other trucks he had driven.

The driver on the morning in question, under Fitch's instructions, took a Fitch truck to Hedstrom's. The driver did not know that a conveyor was to be used that day until after he had arrived at Hedstrom's. The conveyor apparatus is a device about 10 feet long, about five feet high, weighing about 500 to 600 pounds. It is narrower than the conventional coal truck. It is mounted on two wheels and when disconnected the front rests upon the ground. The conveyor, used for unloading coal, consists of a trough, open at one end and with a closed small hopper at the other. During the unloading of the coal from the wagon, the coal falls into the hopper and is carried through the trough

upon an endless rotating belt with slots, and the coal is thus conveyed to the basement or wherever it is desired to be placed. Above the wheels and standing high above the trough of the conveyor is a gasoline motor designed to operate the conveyor when unloading coal. There is a tongue on the front of the conveyor stabilized by two springs, one vertical and one horizontal, and at the tip of the tongue is a hole adapted for attachment to a hook, which is part of the hitching apparatus located at the rear of the truck, in the center. In attaching the conveyor to the truck the hole in the end of the tongue of the conveyor is inserted into the lower hook of the hitch. The top hook of the hitch is then pulled down and the hitch is closed. Above the top hook of the hitch there is a lever, or "dog," which, after the hitch is closed, is pushed down in order to lock it. Attached to the sides of the front of the conveyor are safety chains which, when the conveyor is properly connected to a truck, are firmly attached to the truck by means of hooks placed on each side of the truck for that purpose, and trucks designed to haul conveyors are so equipped. All the trucks that were heretofore so used by the driver of the instant truck had had such hooks. The Fitch truck used on the day in question had no such hooks, but did have a chain, known as a "wheelbarrow chain," across the entire back of the truck. This chain would be used to hold a wheelbarrow if a wheelbarrow was to be taken along for the purpose of unloading the coal. The conveyor in question was not easily attached to the truck, inasmuch as the driver had to force down the lock, or dog, on the truck hitch by hitting it. The customary and usual way to close the hitch is simply to pull it into position. The lock on the instant truck had never come open before, but the driver had complained to the manager at Fitch's concerning the hitch on the truck.

At the time the driver connected the truck to the conveyor, one "Red," the yard superintendent employed by Hedstrom and in immediate charge of the yard, was present. He gave the driver instructions to the effect that the coal was to be unloaded by a conveyor, and he told the driver how to fasten this particular conveyor to the truck. The safety chains were not attached to the truck but were wrapped around the tongue of the conveyor.

The defendant Hedstrom, in support of its position that the trial court ruled properly in entering judgment in its favor notwithstanding the verdict, urges that there was no evidence of independent negligence on its part. The plaintiff in his amended statement of claim alleges that the acts of negligence of Fitch and Hedstrom relied on were joint and several, and the case was tried on that theory.

In the instant case we have a unique situation. Ordinarily, if a person engaged the owner of a truck to do hauling for him, the owner alone would be responsible for the safe condition of the truck and no liability could attach to the person hiring the truck for any defects which might have caused injury to a third person. Here, however, before the truck went on the errand for which it was engaged, an additional step was taken which involved the joint action of both defendants. Hedstrom had the right to determine the method of delivery of the coal, and if the delivery was to be by means of a conveyor, Hedstrom furnished the conveyor which had to be attached to the truck and taken to the place of delivery. Fitch knew or should have known these facts. The Fitch truck was equipped with a hitch to which a conveyor could be attached. Fitch either knew or should have known of the necessity of safety chains. The truck which was sent to Hedstrom was not adapted for the attachment of such chains. There is no evidence in the record to indicate

in what manner, if at all, safety chains could be properly and safely attached to a truck lacking such hooks. Irrespective of any statutory requirement, a truck operator engaged in towing another vehicle is performing an act of potential danger to other operators and pedestrians, and persons using a dangerous instrumentality are required to exercise care commensurate with the danger to be apprehended, in order to prevent injury to others. Staples v. Spelman, 165 Atl. 783 (Conn.). In the instant case equipment was provided on the conveyor designed for securely attaching it to the truck, and those means should have been employed. Failure to use the means was a deviation from the proper standard of safety. Fitch furnished a truck without hooks suitable for the attachment of safety chains. The truck also had an imperfect coupler, of which Fitch's yard manager had been informed. Hedstrom furnished Fitch with a conveyor which had chains properly attached to it. At the time of the attachment of the conveyor to the truck a duty devolved on both Fitch and Hedstrom to see that the united truck and conveyor going upon the streets conformed to a reasonable standard of safety. There seems to be no dispute that if the chains had been properly attached to the truck there would have been no accident. Fitch was aware of the fact that different methods of delivering coal could be demanded of the driver of the truck furnished by her, and that one of the methods of delivery required the conveyance through the streets of a conveyor attached to the truck. One Riley, a witness for Hedstrom and who at the time of the occurrence was manager of the Hedstrom coal yards but was not present at the time of the attachment of the conveyor to the truck, testified that Hedstrom would look at trucks sent it from Fitch to see whether a conveyor could be coupled on to it, and would want to know whether the trucks were the type

which could be coupled on to Hedstrom's type of conveyor. He also stated that if Fitch had sent Hedstrom a driver who was unsatisfactory Hedstrom would report to Fitch telling her that it wanted someone else and would send him back. Fitch on the day in question sent Hedstrom a truck which was not suitable to safely use with the conveyor. The duty rested on Fitch through her servant, the driver, to refuse to use that truck to tow a conveyor, particularly since he knew and had complained about the unsatisfactory hitch on the truck. A duty rested upon Hedstrom through its servants to reject a truck which was not suitable for the proper attachment of a conveyor conforming to reasonable standards of safety. Instead, the agent of Hedstrom instructed Fitch's driver to wrap the chains around the tongue of the conveyor without attaching them in any way to the truck. Hedstrom, of course, could have provided for some other method of unloading the coal which would not have involved the use of a conveyor. Both defendants violated the duty which the law imposed on them. As we have said, the plaintiff's theory during the trial of the case was that both defendants were guilty of negligence and were jointly and severally liable. The instructions given by him and his argument to the jury so indicate, and from the evidence the jury could have properly so found.

A considerable portion of the briefs before us is devoted to a discussion of whether the driver of the Fitch truck at the time in question was a loaned servant of Hedstrom or a joint servant. In the view we take of the case such discussion is not pertinent, nor is the contention of Hedstrom that the fact the accident took place after the unloading of the coal would relieve it from liability. There was sufficient evidence in the record of Hedstrom's negligence to take the case to the jury, and consequently the judg-

ment in its favor notwithstanding the verdict was erroneous.

In its motion for new trial, which was denied by the trial court, Hedstrom in addition to its contention that it was not guilty of negligence urges that the court erred in giving certain instructions, that the plaintiff was guilty of contributory negligence, and that the verdict is excessive.

Among the instructions objected to was one given by the plaintiff, which told the jury that there was in section 130 of the Uniform Traffic Act (par. 227, chap. 95½, Ill. Rev. Stat. 1949) a provision forbidding the operation of a trailer on the highways unless it shall have adequate safety chains. The objection urged is that the conveyor was not a trailer within the statutory definition. The definition of "trailer" as used in the statute, section 4 (a) of the Uniform Traffic Act (par. 101, chap. 95½), is a vehicle "without motive power designed for carrying persons or property and for being drawn by a motor vehicle and so constructed that no part of its weight rests upon the towing vehicle." This definition was not incorporated in the instruction. The instruction of the plaintiff merely quoted section 130 of the Act with reference to the requirement of safety chains on a trailer. It is urged by Hedstrom that the conveyor in question did not conform to the statutory definition and submission of the issue to the jury was error.

■ The plaintiff in his amended statement of claim, which was filed after all the evidence had been heard, included the alleged statutory violation as one of his grounds for recovery. The defendant Hedstrom filed an answer meeting it as an issue of fact, and it was so argued to the jury. Section 130 of the statute was remedial and should be liberally construed. It was a safety measure passed for the benefit and protection of all users of public highways. It was designed to

afford an additional protection so that if the primary connection between the vehicles separated they would still be firmly connected to each other by means of the safety chains. In construing a statute the court must ascertain and give effect to the intention of the legislature. In Petterson v. City of Naperville, 9 Ill.2d 233, the court states that the primary object of statutory construction is to ascertain and give effect to legislative intent, and reiterates the rule laid down in People ex rel. Holvey v. Kapp, 355 Ill. 596, where the court said:

"This intent, as we held in Bowman v. Industrial Com., 289 Ill. 126, 'is to be gathered from the necessity or reason for the enactment and the meaning of the words, enlarged or restricted according to their real intent. In seeking this intention the court will always have regard to existing circumstances, contemporaneous conditions, the object sought to be attained by the statute and the necessity or want of necessity for its adoption. It must also have in mind the language used by the legislature, the evil to be remedied and the object sought to be attained. In construing a statute the court will not be confined to its literal meaning. A thing within the intention is regarded within the statute although not within the letter. A thing within the letter is not within the statute if it is not within the intention. When the intention has thus been ascertained from the reading of the statute, words may be modified or altered so as to obviate all inconsistencies with such intention.' "

It could be argued that under the definition it would be a mixed question of law and fact as to whether or not the conveyor fell under the statutory definition of trailer. Section 4 (a) of the Act, defining "trailer," merely provides that the vehicle, in order to be denominated a trailer, must have been "designed" for carrying persons or property, but there is no

130

requirement that in order to so qualify, persons or property must be in the trailer while it is being operated. Attached to the conveyor at the time when it was being towed was a gasoline motor which was carried by the conveyor through the streets and was intended to be used to motivate the conveyor during the subsequent unloading operation. Section 4 (a) also provides as a part of the definition of a trailer that "no part of its weight rests upon the towing vehicle." As we have said, the purpose of section 130 was a safety measure. A vehicle, the weight of which rested upon the towing vehicle, would by that very fact be so firmly attached that it would not be as likely to break loose and cause damage as one whose weight did not so rest; hence in order to insure safety to the users of the public highway safety chains were required in the latter case. There is very little evidence in the record as to whether or not any of the weight of the conveyor rested upon the truck after it was connected and was being towed through the streets. The record shows that the shaft which attached the conveyor to the truck is flexible, and that when it is attached to the truck the only thing that prevents the conveyor from going up to its maximum range is the fact that it is connected to the truck by the shaft, which would indicate that if any weight rested on the truck it was very little. The legislative intent was to provide an additional measure of safety. Considering the purpose of the statute, the conveyor substantially falls within the definition of a trailer. Applying the rule laid down in the cases cited, this section of the statute was properly applicable to this conveyor. In Sims v. Chicago Transit Authority, 7 Ill.App.2d 21, we reversed a case because the trial court erroneously submitted a nonexistent issue of carrier and passenger relationship to the jury, and we said:

131

"Generally, presumptions upon review favor judgment, and the burden is upon the appellant to point out the errors, if any, calling for its reversal. 222 East Chestnut St. Corp. v. Murphy, 325 Ill. App. 392, 399. There is a presumption that a general verdict under several counts or issues, some of which are good and some bad or unsupported by any evidence, is based on the evidence supporting the good counts or issues. Scott v. Parlin & Orendorff Co., 245 Ill. 460, 466–8, and cases there cited. See also Chicago, B. & Q. R. Co. v. Warner, 108 Ill. 538, 548–9. This presumption obtains apparently even when an instruction on the unsupported counts or issues is submitted to the jury. See Chicago City Ry. Co. v. Foster, 226 Ill. 288, 290; and cf. Schlauder v. Chicago & Southern Traction Co., 253 Ill. 154, 162.

". . .

". . . Where the reviewing court can see the case has been fairly tried, and that the judgment is clearly right upon the facts, and that consequently another trial must necessarily result the same way, it will not reverse on the ground that an erroneous issue has been submitted to the jury. . . ."

The instant case was not a close case, and we do not believe that the injection of the question of the statute, even if it had been erroneous, was reversible error.

Defendant Hedstrom also objects to an instruction given at the request of defendant Fitch on the borrowed servant theory advanced by the latter defendant. Any party to a lawsuit is entitled to have presented to the jury the theory upon which he relies. Under the law, as we have stated, the question of borrowed or loaned servant is not an issue in the case. In any case we think that the instruction complained of substantially stated the law. An instruction, also objected to by Hedstrom, given at the request of the

132

plaintiff, to the effect that if the jury believed that the accident was due to the joint negligence of both defendants as charged in the complaint it might find against both defendants, was proper under the issues raised by the pleadings.

 Counsel for Hedstrom also allege that the plaintiff was guilty of contributory negligence because plaintiff was standing in the street talking to the cab driver, and that therefore the finding of the jury was against the manifest weight of the evidence. Such a contention deserves little consideration. The jury could have properly found from the facts in the case that the plaintiff at the time of the occurrence was exercising due care.

The court erred in sustaining Hedstrom's motion for judgment notwithstanding the verdict and entering judgment accordingly.

Defendant Fitch contends that she was not liable for the negligent acts of the driver of the truck on the theory of respondeat superior because the driver at the time was a special servant of Hedstrom; that the trial court erred in his rulings on the admission of evidence; and that the verdict is excessive.

The argument of Fitch with reference to her liability under the doctrine of respondeat superior has been disposed of in our discussion with reference to the contentions of the defendant Hedstrom.

 Fitch complains that the trial court erred in sustaining an objection to a question asked by her of plaintiff's witness Dr. Macaluso (plaintiff's family doctor). The doctor had testified with reference to his examination and treatment of the plaintiff. Plaintiff had testified that x-rays were taken of him at the Ravenswood Hospital, St. Joseph's Hospital and the Illinois Research Hospital. Dr. Macaluso had testified that x-rays were taken at St. Joseph's Hospital at or about November 30, 1949 and were examined by him;

133

that he did not see the x-ray pictures which had been taken of the plaintiff at the Ravenswood Hospital and he did not know whether any x-ray pictures were taken of him at the Illinois Research Hospital; that on September 15, 1950 x-ray pictures were taken of the plaintiff for the purpose of attempting to determine the cause of a backache of which plaintiff was then complaining; that x-rays were taken to determine the condition of the kidneys; that on July 5, 1953 x-rays were taken of the plaintiff after he had fallen and dislocated his elbow. The witness had testified that the x-rays taken on November 30, 1949 were negative as to fractures and dislocation and disclosed no pathology; that the x-rays taken of the kidneys on September 15, 1950 indicated no abnormality; that the x-rays taken on July 5, 1953 showed no fracture but did show a dislocation. On cross-examination counsel for Fitch asked the following question: "Well, have you ever seen any x-rays with the exception of those pertaining to the dislocation of the left elbow, which indicated the existence of any abnormality in this man?" This question was objected to on the ground that the x-rays would be the best evidence. The court sustained the objection, and stated that the witness had previously answered the question. The defendant then made an offer of proof out of the presence of the jury, and the physician answered the question "no." We think there is merit to the objection as stated by counsel for the plaintiff that the question was improper because it violated the best evidence rule, but it is not necessary to discuss or consider that contention since the ruling of the court was based on the fact, borne out by the record before us, that the question had already been answered in the negative.

 Fitch also objects to the court's ruling on a question asked of plaintiff when he had been called by Fitch as her own witness. Plaintiff, on the presenta-

tion of his case in chief, had testified that on October 17, 1953, while driving his car in which his wife and two persons were passengers, he was in an automobile accident; that the damage to his car was about $35 or $50, although he could not recall what it was. Fitch's counsel, when examining him, after calling him as her witness, asked the following question: "And as a result of that collision, isn't it a fact that your wife and passengers were taken to St. Francis Hospital in Evanston?" The objection of plaintiff's counsel to this question was sustained by the trial court. Counsel for the plaintiff stated that his objection was that the question was improper unless it tends to show that the plaintiff himself had been injured. Before us, Fitch argues that the court should have permitted the question because if it had been shown that his wife had been injured in the accident and hospitalized the jury might draw therefrom an inference that the plaintiff had also been injured, and that from such inference they might further infer that the physical condition of the plaintiff as testified to by his physician during the trial of the case resulted from the later collision. The inferences sought to be drawn by Fitch would not logically follow from the question, no matter how it had been answered.

Fitch also objects to the trial court's permitting Hedstrom's witness Riley to state, over objection of Fitch, that Fitch was in the "cartage business." Subsequently in his argument to the jury Fitch's counsel argued that Fitch was not in the business of delivering coal and stated, "Our business is general cartage, in which we use all types of equipment." Apparently at the time of the argument Fitch's counsel assumed that there was no question that Fitch was in the cartage business. Permitting the witness to so testify was not prejudicial.

Both Hedstrom and Fitch complain that the verdict was excessive and indicates passion and prejudice on the part of the jury.

The defendants introduced no medical testimony. From the record it appears that at the time of the occurrence, which was six years before the trial, the plaintiff was 34 years old and in good health. He participated in athletics, such as baseball, football and bowling. He was a self-employed cab driver. After the accident he was taken to St. Joseph's Hospital in a state of semi-shock, with a swelling on his head at the junction of the spine and the skull about the size of a golf ball. He could not move the muscles in his lower extremities and had radiating pains involving the upper extremities of his body. He had a blurring of vision and a weakness in his left hand. He was unable to move his head freely. He remained in the hospital approximately three weeks, and after being discharged he had to use a cane for approximately 4½ months because his legs would occasionally buckle on him. For three months he was constantly attended by a physician. Approximately 3½ years after the accident he fell because of an attack of numbness of his legs, and dislocated one of his elbows, for which injury he was hospitalized two days.

At the time of the trial the movement of the plaintiff's head was still limited. He still has dizzy spells, and whenever he puts his head on a pillow he has a sensation of floating. He has no feeling in two of the fingers of his left hand. He has shooting pains down his legs and through his left arm, and the left leg is quite numb most of the time. He has lack of control of the left hand and an inability to hold things. He has constant pain in his lower back. When he walks he shuffles, gets sudden dizzy spells and can only walk two or three blocks before he must sit down. His right arm is thicker than his left, and a snapping noise can

136

be heard when he attempts to rotate his head. The left thigh is an inch smaller than the right, and the left calf is one-half inch smaller than the right. He has a narrowing of the cervical disc spaces, which condition is progressive. The discs will continue to narrow and the narrowing will cause pain. At the time of the trial he was still in need of and receiving medical treatment. In 1954 his physician sent him to Illinois Research Hospital, where he was put in traction and remained for 21 days. A felt collar was made for him which he wore, on his neck, for two months. He had a hospital bed at home with a traction bar on the back, which in the month before the trial he had used every day except three. After spending three or four hours in it he then is able to go to sleep. The disc condition might require surgery, but surgery would not be resorted to if the condition could be held under control by regular periods of manipulation of the neck and back by his physician. If surgery was necessary it would cost approximately $1,500. The headaches and dizziness complained of by plaintiff could be caused by a disturbance in the internal ear, and from tests taken it was evident that there was an abnormal condition in the internal ear. This condition of the internal ear could have been caused by a head injury, from a contusion of the brain tissue resulting in the formation of scar tissue, and such condition would be permanent. There was testimony that the disabilities testified to by the plaintiff might have been caused by the physical conditions found by the testifying physicians and that such physical conditions could have been caused by the accident in which the plaintiff was involved.

The out-of-pocket expenses of the plaintiff approximated $4,000. The plaintiff was unable to continue at his former occupation where, as the owner and operator of a cab, working 12 hours a day, he would make

$10 to $25 a day depending on the weather. He had other jobs from time to time, and at the time of the trial was working as a licensed investigator for the State of Illinois making $300 a month plus expenses.

The amount of the judgment was high. The plaintiff's injuries were severe. There is no precise rule by which an award of damages can be fixed in an action for personal injuries because compensation for them does not lend itself to mathematical computation. In the case before us, the question of damages involves no question of the weighing of evidence. The only question presented to us is whether the jury on the evidence before them could have returned the verdict in issue. Here the trial court denied the motion for a new trial, and the denial by the trial court of a motion to set aside a verdict claimed to be excessive is entitled to weighty consideration. The responsibility rests upon a trial court to carefully consider the evidence in the case before it, and in a proper case where the verdict is excessive, to either enter a remittitur or grant a new trial. There is nothing in the record to indicate passion or prejudice on the part of the jury. The question before us is as to whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. As is said in the recent article, "Damages in Accident Cases" by James, in 41 Cornell Law Quarterly, p. 582:

"What then is compensation? The primary notion is that of repairing plaintiff's injury or of making him whole as nearly as that may be done by an award of money. The 'remedy [should] be commensurate to the injury sustained.' [Rockwood v. Allen, 7 Mass. 254, 256.] '[W]hoever does an injury to another is liable in damages to the extent of that injury.' [Dexter v. Spear, 7 Fed. Cas. 624, No. 3867 (C.C.D.R.I. 1825)] Sometimes this can be accomplished with a fair degree

of accuracy. But obviously it cannot be done in anything but a figurative and essentially speculative way for many of the consequences of personal injury. Yet it is the aim of the law to attain at least a 'rough correspondence between the amount awarded as damages and the extent of the suffering,' [Restatement, Torts sec. 903, comment a] or other intangible loss. . . ."

In Downs v. Baltimore & Ohio R. Co., 345 Ill. App. 118, this court sustained a judgment for $75,000 in favor of the plaintiff where the injuries were no more severe than they were in the instant case, and the court in that case said, citing Princell v. Pickwick Greyhound Lines, 262 Ill. App. 298, where a similar verdict was permitted to stand, that there was sound precedent for affirming the judgment. Here there was sufficient evidence in the record to support the jury's verdict.

The motions of defendants Hedstrom and Fitch for a new trial were properly overruled.

The judgment of the Superior Court of Cook County entered against defendant Fitch is affirmed. The judgment entered in favor of defendant Hedstrom, notwithstanding the verdict, is reversed, and the cause remanded to the Superior Court with directions to enter judgment on the verdict in favor of plaintiff and against defendant Hedstrom.

Affirmed in part; reversed in part and cause remanded with directions.

ROBSON, P. J. and SCHWARTZ, J., concur.