Max Myers, Plaintiff-Appellee, v. Francis Nelson, Defendant-Appellant.

Gen. No. 11,752.

Second District, Second Division.

September 5, 1963.

Thomas, Davis & Kostantacos, of Rockford (Charles H. Davis, of counsel), for appellant.

Johnson and Palmer, of Rockford, and Greenfield and Levin, of Chicago (Kenneth D. Palmer, of counsel), for appellee.

WRIGHT, J.

This action was brought by the plaintiff, Max Myers, to recover damages for personal injuries sustained by the negligence of the defendant, Francis Nelson, in driving his automobile into the rear of a truck driven by the plaintiff. The case was tried before a jury, a verdict was returned in favor of the plaintiff and against the defendant for $20,000 and judgment was entered upon the verdict.

Upon hearing of defendant's post-trial motion for a new trial, the trial court ordered the plaintiff to accept a remittitur of $5,000 and further ordered that upon plaintiff's failure to do so that a new trial be granted. Plaintiff accepted the remittitur and the trial court vacated the $20,000 judgment and entered judgment on the $20,000 verdict in the sum of $15,000 in favor of the plaintiff and against the defendant. Defendant appeals from this judgment.

The defendant concedes that the verdict of the jury finding him guilty of negligence which was the proximate cause of the collision is supported by the evidence. The sole issue before us on appeal is the amount of the verdict and judgment. Defendant contends that the verdict was so grossly excessive as to indicate passion or prejudice on the jury's part and that it was not cured by the $5,000 remittitur, and that, therefore, a new trial should be granted.

This case arose out of a collision which occurred on August 24, 1956, near Rockford, Illinois. The plaintiff was 28 years of age at the time of the occurrence and was driving a truck which was struck in the center rear by defendant's automobile. The impact was such that the plaintiff's head was thrown backward over the seat into the rear window of the

476

cab shattering the safety glass. Plaintiff was dazed for several seconds but was able to bring his truck under control and to a stop. He had a bump on the back of his head, felt dizzy and had a headache. His neck began to stiffen and he felt the beginning of pain in his back, neck and shoulders. He testified that he had more pain as time went on. The plaintiff went to the Rockford Memorial Hospital by himself within an hour or two after the collision and was examined by Dr. Dearborn. The doctor had x-rays taken of the skull and neck of the plaintiff but did not prescribe any medication and informed the plaintiff to return if his neck bothered him. Plaintiff testified he returned a few days later to see the doctor and that the doctor prescribed "neck stretching treatments." The plaintiff was given six or eight of these treatments which lasted about half an hour each. The treatments would relieve him for a couple of hours and then he would have more pain in his neck. The plaintiff testified that he could not turn his head fast in either direction and if he did, he would get a catch and it would seem to lock where he couldn't straighten up for a few seconds. The catch in his neck was painful and it seemed like the muscles were drawing tight on one side and would not release right away. The "neck stretching treatments" which he took lasted over a period of two or three weeks.

Plaintiff testified that after the physiotherapy treatments, he did not see Dr. Dearborn again as he felt the treatments were not doing him any good and he stated, "I made up my mind to live with the condition." Plaintiff testified that he had never had any trouble with or injury to his back or neck before the accident. The statement of the Rockford Memorial Hospital for services to the plaintiff was in the sum of $76 and the statement of Dr. Dearborn for treatment on two occasions was in the sum of $4. The accident happened on a Thursday and the plaintiff

returned to work Friday but did not work a full day. He testified that he continued to work for his employer and that he lost some time from work but did not know how much. At the time of the trial, he was still employed as a truck driver by the same employer and was making more money at the time of trial than at the time of the accident due to an hourly increase from $2.25 to $3.30 an hour.

The only medical evidence was given by a witness called in behalf of the plaintiff. This witness was Dr. Gerald J. Rabin, an orthopedic surgeon of Chicago, Illinois. Dr. Dearborn was not called as a witness in behalf of either the plaintiff or defendant. The defendant offered no medical evidence concerning plaintiff's alleged injuries. Dr. Rabin testified that he first examined the plaintiff on April 12, 1962, and at that time he knew he might be called to testify in this case. The doctor made a complete physical examination of the plaintiff and x-rays were taken of his head, neck, cervical and dorsal spine. Since the alleged injuries sustained by the plaintiff are very much in issue, we are taking the liberty of quoting below part of the doctor's testimony as summarized in defendant's Abstract of Record:

> "The objective findings of the examination were limited specifically to the patient's neck. And they revealed mainly that the patient had some spasm of the neck musculature. It revealed the trapezius muscles which are the muscles that extend between the neck and shoulder which were also spastic. The neck musculature as well as the trapezius muscles were very tender to touch.
>
> Motion of the head on the neck in all directions was within the range of normal. The patient elicited pain in the back of the neck and in the trapezius area. These were the only objective findings. By spastic it is meant the muscles were

478

rigid, they were hard, had lost their tone; they had lost their normal pliability which muscles normally have. The examination of the X-rays revealed there was a loss of the normal curvature of the spine. The cervical spine normally makes what is called a lordotic curve, which is a concave curve, pointing with the concavity anteriorly. This is the normal anatomical curve. In this patient there was loss of the cervical curve, a straightening of the bones from the cervical spine and a loss of the cervical lordosis.

This straightening of the lordotic curve is an indication of injury to the soft tissue, the capsules, and the ligamentous about the joints of the neck and the bones involved in the neck, and the area splinting itself to accommodate these injuries and in order to alleviate the injury present in the neck. I have an opinion that the normal cause for the straightening of the lordotic curve is first and foremost the injury to the soft tissues, and the capsules, to the joints. Secondly, it may be due to an injury of the bones such as fractures and things of that nature, which is traumatic. Or it may be due to certain diseases with the destruction of the bones. But none of these were present, except the first findings. Trauma can be either a direct blow to an area, for instance, to the neck. It can be a snapping of the neck backward and forward. It can be a sudden motion of the head on the neck causing a snapping of the muscles or the ligamentous structures, or the capsule. It can be just a motion suddenly of the head backward and forward. All of these types of motion are a sudden impingement upon the normal stability of the neck, forcing it to go in one direction or another direction suddenly, causing injury to the soft tissue. The spastic condition of the muscles is an attempt of the body to

compensate for this straightening of the lordotic curve and is also due to the injury to the muscles and soft tissues.

This neck injury is called a whip lash type cervical sprain of the neck or an extension flexion injury. Extension means bringing your head back and flexion is flexing it forward. Pain is normally associated with this condition, and in my opinion the condition which I found Mr. Myers to have was one which would cause pain. There was no loss of motion of the head upon the neck."

After the above testimony, Dr. Gerald J. Rabin was then asked a hypothetical question which summarized the facts of the collision, the medical evidence and the plaintiff's complaints concerning his injuries. He testified that the hypothetical person sustained a severe whiplash injury, with injury of the capsule and soft tissue musculature and ligaments of the neck, which has resulted in the patient having a permanent loss of the cervical lordosis and permanent recurrence of pain and snapping of his neck. He further testified that such an injury would definitely produce pain and that the condition was permanent. The doctor further testified that he could recommend a course of physiotherapy and medication to relieve pain but that it would not cure the condition found.

Where there is evidence fairly tending to support the verdict of the jury and there is no showing that the jury were influenced by passion and prejudice, the excessiveness of a verdict may be cured by a remittitur, and the judgment for the part unremitted may be affirmed by a court of review. ILP Appeal and Error, Vol 2, Sec 783.

The fact that the trial court regarded the verdict as excessive and required a remittitur of a part thereof, does not necessarily establish or require this court to hold that the award was so grossly excessive as to

480

warrant the conclusion that the jury were moved by passion or prejudice. The practice of filing a remittitur is well established in this state and such a remittitur is not to be taken as a concession that the jury was actuated by passion or prejudice. Andres v. Green, 7 Ill App2d 375, 129 NE2d 430.

There is no precise rule by which an award of damages can be fixed in an action for personal injuries because compensation for them does not lend itself to mathematical computation. The rule is that a verdict for personal injuries will not be disturbed by a reviewing court unless so palpably excessive as to indicate the jury acted from some improper motive. Lester v. Hennessey, 29 Ill App2d 11, 172 NE2d 403. The question before us is whether or not the amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. Barango v. Hedstrom Coal Co., 12 Ill App2d 118, 138 NE2d 829.

An examination of the evidence in the instant case pertaining to plaintiff's injuries, we believe, affords ample support for the verdict as reduced by the remittitur. Where the liability is uncontradicted as here, the reviewing court should not substitute its judgment on the question of damages for that of both the jury and the trial court. The amount of the damages to be fixed is a matter within the discretion of the jury. The mere fact that the trial court required a remittitur does not necessarily require this court to hold that the amount of the verdict was so excessive as to warrant the conclusion that the jury were moved by passion or prejudice. Lester v. Hennessey, supra.

We do not think the award made can be said to be of such magnitude as to show that the verdict of the jury was prompted by any such improper motive.

Upon careful examination of the record, we are of the opinion that the verdict was not so grossly ex-

cessive as to require the granting of a new trial and that the trial court did not err in ordering the remittitur.

The judgment of the Circuit Court of Winnebago County is affirmed.

Judgment affirmed.

CROW, PJ and SPIVEY, J, concur.