957 So.2d 80 (2007)
James SAULLO, as Personal Representative, etc., Appellant,
v.
Jessie J. DOUGLAS and Dart Transit Company, Appellees.
No. 5D06-817.
District Court of Appeal of Florida, Fifth District.
May 11, 2007.
*81 Ross Bennett Gampel of Klemick and Gampel, P.A., Miami, and Steven M. Goldsmith, of Steven M. Goldsmith, P.A., Boca Raton, for Appellant.
David R. Evelev, Griffith J. Winthrop, and Julianne J. Flynn, of Alvarez, Sambol, Winthrop & Madson, P.A., Orlando, for Appellee, Dart Transit Company.
No Appearance for Appellee, Jessie J. Douglas.
*82 MONACO, J.
James Saullo, as personal representative of the Estate of James J. Saullo, seeks review of the final order of summary judgment granted in favor of the appellee, Dart Transit Company, one of the of two defendants below. Because there are factual issues concerning the liability of Dart that are still outstanding, we reverse.
The essentially uncontested facts reflect that shortly before the incident that gave rise to this suit occurred the other defendant below, Jessie Douglas, a professional truck driver, was driving a tractor-trailer rig through central Florida. The tractor was owned by Mr. Douglas, but leased to Dart, and the trailer was fully owned by Dart. Pursuant to the operating agreement between Dart and Mr. Douglas, which defined the driver's status as that of an independent contractor, Mr. Douglas agreed to lease the tractor permanently to Dart. Because Dart was an interstate carrier subject to federal regulation, the operating agreement was drafted in accordance with the requirements of federal regulations. Under the standard contract Mr. Douglas agreed to drive the tractor exclusively to haul freight in trailers owned by Dart.
While asleep at a rest area on one such trip in which Mr. Douglas was transporting freight for Dart, Mr. Douglas received a call from his brother, who related that his car was stuck in the mud not far from where Mr. Douglas was resting. He asked Mr. Douglas to help him remove it, and Mr. Douglas agreed to do so. When Mr. Douglas arrived at a point near to his brother's location, he parked and detached the trailer in the far right-hand lane of a four-lane roadway, and directed his brother's girlfriend to park her car behind the trailer and to activate the automobile's emergency flashers. He did so because the trailer did not have operational lights when detached from the tractor. Mr. Douglas did not take the precaution of setting emergency flares or safety triangles around the trailer. After detaching the trailer, Mr. Douglas drove the tractor down the road to help with his brother's vehicle.
James J. Saullo was killed in the early morning hours purportedly when he swerved his automobile to avoid the trailer and the automobile parked on the roadway. Mr. Saullo had been drinking and playing pool at a bar, and was on his way to a friend's apartment at the time of the incident. When he came upon the vehicles, he apparently swerved sharply to avoid a collision, lost control of his car, and slammed into a tree. He was legally intoxicated and not wearing a seatbelt at the time of the collision.
The personal representative of Mr. Saullo's estate filed a wrongful death action against Mr. Douglas and Dart. Dart moved for summary judgment. The Estate opposed the motion, arguing, first, that the federal regulations that govern interstate trucking imposed liability on Dart for the actions of Mr. Douglas, and alternatively, that Dart was liable by virtue of the application of respondeat superior to the dangerous instrumentality doctrine. The trial court, however, granted summary judgment in favor of Dart, holding that Dart was not liable for the actions of Mr. Douglas under either theory. The Estate appealed.
A resolution of this case requires us first to examine the federal regulations governing interstate tractor-trailer trucks. We begin with the enabling legislation.
In 1956, Congress expanded the authority of the Interstate Commerce Commission ("ICC"), to permit the agency to regulate more closely the lease of motor vehicles used in interstate commerce. R. *83 Clay Porter & Elenore Cotter Klinger, The Mythology of Logo Liability: An Analysis of Competing Paradigms of Lease Liability for Motor Carriers, 33 TRANSP. L.J. 1, 5 (2005) [hereinafter Logo Liability]. Although the wording of the enabling statute has changed slightly since 1956, the substance of the statute remains the same today. Of particular relevance to the present controversy, the current version of the statute, 49 U.S.C. 14102 (2007),[1] authorizes the Secretary of Transportation to require an interstate motor carrier that uses motor vehicles it does not own to transport property under an agreement with another party to "have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier." 49 U.S.C. 14102(a)(4). The enabling legislation, however, does not specifically address the liability of a carrier that chooses to use nonowned tractors.
One of the primary reasons Congress expanded the province of the Secretary, and thus, the ICC,[2] was "to protect the public from the tortious conduct of judgment-proof operators of interstate motor carrier vehicles," by requiring motor carriers "to assume full direction and control of leased vehicles." See Price v. Westmoreland, 727 F.2d 494, 496 (5th Cir.1984). A fair reading of the leasing regulations yields the notion that they were specifically intended to prevent motor carriers from avoiding responsibility for the negligence of their drivers through the use of an owner-operator relationship. Logo Liability, 33 TRANSP. L.J. at 6. The ICC effectuated this purpose by promulgating leasing regulations requiring, among other things, that leases be in writing and "provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement. . . ." (emphasis added). See 49 C.F.R. 1507.4 (1974).[3] Moreover, the regulations require motor carriers that use leased equipment to provide the lessor with a placard that contains information identifying the motor carrier for whom the equipment is being operated. Logo Liability, 33 TRANSP. L.J. at 6 (citing 49 C.F.R. 390.21 (2005)). The placard is usually affixed to the door of the tractor. Before the regulations were amended in 1986, it was the motor carrier's responsibility to retrieve the placards when the lease terminated. Id. at 6 (citing 49 C.F.R. 1507.4(d)(1) (1974)).
The leasing regulations gave birth to a judicially-created doctrine called "logo liability." Id. Under this rule, the mere presence of a motor carrier's placard in a tractor leased by the carrier created an irrebuttable presumption that the lease continued at all times in effect. Ross v. Wall St. Sys., 400 F.3d 478, 479-80 (6th Cir.2005). Courts that applied the doctrine of logo liability consistently held that the federal leasing regulations preempted *84 state law in tort actions where a member of the public was injured by the negligence of a motor carrier's employee while operating the motor carrier's vehicle. See Price, 727 F.2d at 496.
Thus, considerations steeped in respondeat superior and master-servant relationships were essentially disregarded. See Simmons v. King, 478 F.2d 857 (5th Cir. 1973). Rather, under the leasing regulations, the lessor-truck driver was deemed to be a "statutory employee" of the lessee-motor carrier, and the motor carrier was, accordingly, liable as a matter of law for the negligence of the driver. The practical effect of the doctrine of logo liability was, therefore, to impose strict liability on a motor carrier for the negligence of its driver, regardless of whether the driver was an independent contractor and regardless of whether the lease was actually in effect at the time the injury occurred, so long as the motor carrier's placard was affixed to the tractor. See Ross, 400 F.3d at 479-80 (6th Cir.2005).
In 1986, however, the ICC amended the leasing regulations to clarify that it never intended "to assign liability based on the existence of placards or to interfere with otherwise applicable State law." Lease & Interchange of Vehicles (Identification Devices), 3 I.C.C.2d 92, 93-94 (1986). Under the amended regulations, the motor carrier was no longer required to obtain a receipt from the driver when the driver returned the placard upon termination of the lease. See Graham v. Malone Freight Lines, Inc., 948 F.Supp. 1124, 1133 n. 14 (D.Mass.1996); 49 C.F.R. 1057.4(d) (1985). At the time of the 1986 amendments, the ICC explained:
As noted by the comments, certain courts have relied on Commission regulations in holding carriers liable for the acts of equipment owners who continue to display the carrier's identification on equipment after termination of the lease contract. We prefer that courts decide suits of this nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will produce appropriate results.
Lease & Interchange of Vehicles (Identification Devices), 3 I.C.C.2d 92, 93-94 (1986)(emphasis added).
In the wake of the 1986 amendments and accompanying ICC comments, many federal courts disavowed the logo liability doctrine. The majority of courts, however, apparently not taking the ICC at its word, still interpreted the amended regulations to impose liability whenever a lease was actually in effect, regardless of whether the driver was acting within the scope of his agency or employment at the time. See, e.g., Johnson v. S.O.S. Transp., 926 F.2d 516, 521-22 (6th Cir.1991). That is to say, although the ICC specifically announced that the regulations would not "supersede otherwise applicable principles of State tort, contract and agency law," a number of courts applied the regulations to accomplish that very result. One particularly important practical effect of the "lease liability" theory was to nullify lease provisions identifying the lessor-truck driver as an independent contractor of the lessee motor carrier, at least when the leases were long-term, or "permanent," leases. See Logo Liability, 33 TRANSP. L.J. at 14-15.
The ICC yet again amended the leasing regulations in 1992, this time specifically to address the independent contractor issue. The amended leasing provision, currently *85 codified at 49 C.F.R. 376.12, added subsection (c)(4), that provides:
Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.
49 C.F.R. 376.12(c)(4) (2007). Paragraph (c)(1) requires the lease to "provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. 376.12(c)(1) (2007). When the 1992 amendments were adopted, the ICC commented:
The Commission's regulations are silent on the agency status of lessors, and our decisions are clear that the Commission has taken no position on the issue of independence of lessors. . . . While most courts have correctly interpreted the appropriate scope of the control regulation and have held that the type of control required by the regulation does not affect "employment" status, it has been shown here that some courts and State workers' compensation and employment agencies have relied on our current control regulation and have held the language to be prima facie evidence of an employer-employee relationship. These State agencies often find that the current regulation evidences the type of control that is indicative of an employer-employee relationship. We conclude that adopting the proposed amendment will reinforce our view of the neutral effect of the control regulation and place our stated view squarely before any court or agency asked to interpret the regulation's impact.
Petition to Amend Lease & Interchange of Vehicle Regulations, 8 I.C.C.2d 669, 670-72 (1992)(emphasis supplied). This comment, especially when considered in conjunction with the ICC's 1986 comments, suggests that the view imposing strict vicarious liability was not the result intended by the leasing regulations.
Despite these comments from the ICC, the language of the regulation itself has caused confusion. More specifically, 49 C.F.R. 376.12(c)(4) compels a motor carrier's lease creating an independent contractor relationship with a driver to comply with 49 U.S.C. 14102. That statute requires a motor carrier to be responsible for and to control the leased equipment "as if the motor vehicles were owned by the motor carrier." This language has caused some courts to conclude that the leasing regulations may indeed have been intended to impose strict vicarious liability when a lease agreement is in effect, even when the driver is an "independent contractor." See, e.g., Morris v. JTM Materials, Inc., 78 S.W.3d 28, 40-42 (Tex.App.2002). Certainly, one could interpret the regulation to mean that a scope of employment analysis is still irrelevant.
Thus, we are faced with two competing views of the regulations and their effect on state tort law in negligence actions. One view focuses on the specific language of the lease regulations and applies a "strict agency" or "lease liability" paradigm. The other focuses on the enabling statute and the administrative directives and compels a state law respondeat superior and "scope of employment" analysis. Compare Morris with Parker v. Erixon, 123 N.C.App. 383, 473 S.E.2d 421 (1996). If the former is adopted, the motor *86 carrier is liable as a matter of law for the negligence of its hired driver regardless of whether the driver was under the control of the motor carrier at the time the tort was committed. If the latter is adopted, then liability attaches to the carrier only if the driver was acting within the scope of his employment at the time of the accident. It appears that this issue is one of first impression in Florida.
We think the better view is the one that begins with the enabling statute, as amplified by the ICC directives, adopted and applied by the Parker court. It is clear from the repeated comments of the administrative body itself that the ICC regulations were never intended to impose greater liability on carriers using either leased equipment or an independent contractor than that imposed when a carrier uses its own equipment or employees. See Parker.
The trial court in the present case did indeed apply state law master-servant concepts in granting summary judgment for Dart. It found, first, that the actions of Mr. Douglas in leaving the trailer on the roadway and driving the tractor to extricate his brother's car "was clearly not within the course and scope of his employment or relationship with Dart." Under our jurisprudence the determination of whether an employee or independent contractor was acting within the scope of his or her agency is a question of law when the facts are not in dispute. See Whetzel v. Metropolitan Life Ins. Co., 266 So.2d 89, 90 (Fla. 4th DCA 1972). The court then noted that as a general proposition, an employer is not liable for the actions of its employee under the circumstances presented by this case. Finally, it examined the dangerous instrumentality doctrine and concluded that as a matter of law, a trailer is not a dangerous instrumentality, "and thus the employer was not subject to vicarious liability." It drew support for this conclusion from Cheung v. Ryder Truck Rental, Inc., 595 So.2d 82 (Fla. 5th DCA 1992); Pullman, Inc. v. Johnson, 543 So.2d 231 (Fla. 4th DCA 1987), review dismissed, 549 So.2d 1014 (Fla.1989); and Foster v. Lee, 226 So.2d 282 (Fla. 2d DCA 1969).
The trial court was correct in applying state law concepts to the facts of this case, and in concluding that Mr. Douglas was not acting within the scope of his employment at the time of the accident. The dangerous instrumentality issue, however, presents yet another gnarly question.
Florida's dangerous instrumentality doctrine is based on common law principles governing master and servant relationships. See Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629 (1920); Edwards v. ABC Transp. Co., 616 So.2d 142, 143-44 (Fla. 5th DCA 1993). At common law the master was liable for his or her servant's negligence when the servant was entrusted with and had custody and control of a dangerous instrumentality at the time of the injury. Anderson. We generally see the dangerous instrumentality doctrine applied to impose strict vicarious liability on the owner of a motor vehicle who voluntarily entrusts it to a person whose negligent operation causes injury to another. See Aurbach v. Gallina, 753 So.2d 60, 62 (Fla.2000). The doctrine is not based on respondeat superior or agency, but on "the practical fact that the owner of an instrumentality which [has] the capability of causing death or destruction should in justice answer for misuse of this instrumentality by anyone operating it with his knowledge and consent." Meister v. Fisher, 462 So.2d 1071, 1072 (Fla.1984); see also Southern Cotton Oil Co.; Jordan v. Kelson, 299 So.2d 109 (Fla. 4th DCA 1974), cert. denied, 308 So.2d 537 (Fla. 1975).
*87 In order for the dangerous instrumentality doctrine to apply the person held vicariously liable must have an identifiable property interest in the instrumentality, such as ownership, rental, bailment or a leasehold interest in the vehicle. See Aurbach, 753 So.2d at 63. Thus, in Aurbach the Florida Supreme Court recognized the vicarious liability of a lessee of a motor vehicle who authorizes another to operate that vehicle. It is well-established in Florida, as the trial court correctly found, that the trailer portion of the tractor-trailer rig is not a dangerous instrumentality. See Pullman; Garcia v. Mid-Florida Hauling, Inc., 350 So.2d 1141 (Fla. 1st DCA 1977); Foster. This court has so held in a number of cases. See, e.g., Edwards; Cheung. In the present case, therefore, liability against Dart can only be made out based on the operation of the tractor by Mr. Douglas.
Dart was the owner of the trailer and the lessee of the tractor. Dart put Mr. Douglas in operational control of both the tractor and the trailer. We conclude that an application of the principles of Aurbach to the facts of this case results in the conclusion that Dart is subject to vicarious liability for the operation of the tractor by Mr. Douglas.
We have recently said the following with respect to the dangerous instrumentality doctrine:
The doctrine imposes strict liability upon the owner of a motor vehicle by requiring that an owner who "gives authority to another to operate the owner's vehicle, by either express or implied consent, has a nondelegable obligation to ensure that the vehicle is operated safely." Aurbach v. Gallina, 753 So.2d 60, 62 (Fla.2000). The doctrine is intended to foster greater financial responsibility to pay for injuries caused by motor vehicles because the owner is in the best position to ensure that there are adequate resources to pay for damages caused by its misuse. Id. at 62. The doctrine also serves to deter vehicle owners from entrusting their vehicles to drivers who are not responsible by making the owners strictly liable for any resulting loss.
. . .
Liability of the owner is said to be "strict" because a plaintiff need not prove that an owner negligently entrusted the vehicle to its operator for liability to attach. However, the doctrine is distinguished from strict liability for ultra-hazardous activity, because the plaintiff must prove some fault, albeit on the part of the operator, which is then imputed to the owner under vicarious liability principles. Id. Although under master-servant law, the master is vicariously liable for the acts of the servant when the servant acts within the scope of his employment, the doctrine imputes liability to an owner even when the operator disobeys restrictions on the use of the vehicle, unless the disobedience rises to the level of theft or conversion. Jackson, 617 So.2d at 1054; Susco Car Rental Sys. of Fla. v. Leonard, 112 So.2d 832, 836 (Fla.1959).
Burch v. Sun State Ford, Inc., 864 So.2d 466, 470 (Fla. 5th DCA), review dismissed, 889 So.2d 778 (Fla.2004). It appears to us that Dart, as the lessee of the tractor and the organization that allowed Mr. Douglas to operate it, was in the best position to assure that the vehicle was operated safely, and was, therefore, in the best position to ensure that there were adequate resources to pay for damages caused by its misuse.
The Estate specifically alleged that the negligent act on which it bases its wrongful death claim was the negligent operation of the tractor by Mr. Douglas in *88 using the tractor to park the trailer on the roadway. In Cheung we concluded in considering the application of the dangerous instrumentality doctrine that a summary judgment was improperly granted in favor of the lessor of a vehicle that was towing another car because the lessor made it possible for the non-lessee-driver of the rented truck to inflict injury on others by his negligent operation of the truck while towing the car. In that case a wheel came off of the towed vehicle and struck another vehicle, injuring its driver. In coming to this conclusion we quoted Barango v. E.L. Hedstrom Coal Co., 12 Ill.App.2d 118, 138 N.E.2d 829, 833 (1956), as follows:
Irrespective of any statutory requirement, a truck operator engaged in towing another vehicle is performing an act of potential danger to other operators and pedestrians, and persons using a dangerous instrumentality are required to exercise care commensurate with the danger to be apprehended, in order to prevent injury to others.
Here, Dart through various contractual agreements put both the tractor and trailer into the hands of Mr. Douglas. While the trailer by itself may not have been a dangerous instrumentality, the tractor clearly was. The Estate specifically alleges that the negligent act that led to the death of Mr. Saullo was in the performance of that operation of the tractor which led it to park the trailer on the roadway. We conclude that the dangerous instrumentality doctrine would properly be applied to this case. If Mr. Douglas was driving a dump truck that negligently deposited a load of gravel on the roadway before driving off, and if Mr. Saullo was killed as a result of his swerving to avoid the negligently deposited gravel, the doctrine would be clearly applicable. Just because the trailer was dropped off rather than a load of stones should not change that result.
There are obviously causation issues growing out of our holding that the trial court must wrestle with before this case can be brought to a conclusion. Causation, of course, is generally an issue for the trier of fact unless reasonable persons could not differ in that respect. See Helman v. Seaboard Coast Line R.R. Co., 349 So.2d 1187 (Fla.1977). If there is any doubt at all concerning proximate cause, that doubt should be left to a jury. See Petruska v. Smartparks-Silver Springs, Inc., 914 So.2d 502 (Fla. 5th DCA 2005); Goode v. Walt Disney World Co., 425 So.2d 1151 (Fla. 5th DCA 1982). As currently framed, at least, the facts of this case present an issue of causation about which reasonable minds could differ.
Summary judgment is appropriate only when the pleadings, discovery, affidavits and other evidentiary materials demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fla. R. Civ. P. 1.510(c)(2006). Because of our disposition of this appeal as it relates to the dangerous instrumentality doctrine, Dart is not currently entitled to a judgment as a matter of law. Accordingly, we find that the trial court erred in granting summary judgment in favor of Dart and reverse.
REVERSED and REMANDED.
THOMPSON and TORPY, JJ., concur.
NOTES
[1] 49 U.S.C. 14102 was formerly codified at 49 U.S.C. 11107 (1995) and 49 U.S.C. 304 (1956). The current version of the statute, and the regulations promulgated pursuant thereto, have not changed significantly since the accident giving rise to the present case occurred in 2002.
[2] The ICC was abolished by the ICC Termination Act of 1995, and it was supplanted by a new regulatory agency, the Federal Motor Carrier Safety Administration ("FMCSA"). See Logo Liability, 33 TRANSP. L.J. at 27 n. 19.
[3] 49 C.F.R. 1507, which contained the federal leasing regulations, was re-designated to 49 C.F.R. 376. See, e.g., 49 C.F.R. 376.12 (2007).